Christopher P. Wesierski [Bar No. 086736]
  *cwesierski@wzllp.com*
Kathryn J. Harvey [Bar No. 241029]
  *kharvey@wzllp.com*
WESIERSKI & ZUREK LLP
29 Orchard Road
Lake Forest, California 92630
Telephone: (949) 975-1000
Facsimile: (949) 756-0517

Attorneys for Defendants, COUNTY OF SAN BERNARDINO, CORRIN CASSIDY, and CAMERON STANLEY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| TODDERICK RANDALL, individually,<br><br>        Plaintiff,<br><br>    vs.<br><br>COUNTY OF SAN BERNARDINO; CORRIN CASSIDY; CAMERON STANLEY and DOES 1-10, inclusive,<br><br>        Defendants. | Case No. 5:24-cv-00086-SSS-SP<br>*Assigned to*:<br>Hon. Sunshine S. Sykes<br><br>**DECLARATION OF CAMERON STANLEY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL JUDGMENT**<br><br>*[Filed Concurrently with Motion for Summary Judgment; Statement of Undisputed Material Facts; Request for Judicial Notice; Declarations of , Corrin Cassidy, and Edward Flosi; and Proposed Order]*<br><br>**Date:   April 11, 2025<br>Time:   2:00 p.m.<br>Courtroom:  2**<br><br>Trial Date: July 14, 2025 |

.

1

4928-1809-0270.1 SBD-00026

DECLARATION OF DEPUTY CAMERON STANLEY

## DECLARATION OF CAMERON STANLEY

I, Cameron Stanley, declare as follows:

1. I am over the age of 18 years. I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein.

2. I have been employed with the San Bernardino County Sheriff's Department since June 2021. I have been assigned as a Patrol Deputy at the Victorville Police Station since November 2021. In my position as Patrol Deputy I received 12 – 14 weeks of field training.

3. Prior to August 19, 2022, during my time in law enforcement, I had never been a shooter in a deadly force encounter.

4. I am aware of the San Bernardino County Sheriff's Department's policies and guidelines, including those involving the use of deadly force. I am also aware of the State of California laws, policies, and/or guidelines involving law enforcement and deadly force.

5. On Friday August 19, 2022, at approximately 1202 hours, my Partner, Corrin Cassidy, and I were dispatched to the WinCo Foods Supermarket, located at 15350 Roy Rodger Drive, in Victorville, California.

6. Sheriff's Dispatch received a 911 call from the store manager Frank Calderon, who reported a subject, later identified as Todderick Randell ("Mr. Randall") was inside the store. It was reported Randall wore a grey tank top, black cut off sweatpants, and was around 25 to 30 years old. It was further reported Randall was armed with a knife or box cutter, and that while he was inside the store, Randall obtained a large bottle of alcohol from the shelf and started to drink it. It was reported Randall was openly carrying the knife in his right hand as he drank from the bottle of alcohol. Mr. Calderon reported that he wanted Mr. Randall to leave the store.

7. Deputy Corrin Cassidy and I arrived at WinCo in separate vehicles, but around the same time. We entered the store together.

8. When I entered the store, I observed many customers inside. I would describe the store as heavily populated. I had to maneuver around customers as I entered the store. I also observed numerous customers in checkout lines. I would estimate that at the time I entered the store I saw at least 75 customers inside, and that was only near the entrance area.

9. Seeing so many customers made me worried because it is not typical to respond to calls with individuals wielding an open knife in a busy store. I was immediately concerned about public safety.

10. I first spoke to the manager and reporting party, Frank Calderon. He appeared frightened. Mr. Calderon pointed out the located of the suspect, stating, "that's the guy with the knife." Mr. Calderon confirmed that the suspect was drinking alcohol and confirmed that he wanted him to leave the store.

11. When I first approached Mr. Randall, he was standing alone in the alcohol isle. I stood about 15 feet away, and I observed that he had an open bottle of alcohol in his hand, which I believed to be yellow margarita mix. The bottle was half empty, and he appeared to have drunken half of it. In his right hand he was holding a heavy-duty folding box knife, the kind used in construction. The knife handle was approximately 5-6 inches, and the blade approximately 1 inch.

12. When I first observed the Mr. Randall, he looked disoriented. I observed him "fumble" when he stepped. Based upon my training, experience and observations, I believed Mr. Randall was under the influence of alcohol.

13. At this point in my encounter, I believed there was probable cause a suspected crime had been committed. He did not voluntarily leave the store when asked, constituting trespassing; he appeared to be publicly intoxicated; and he was brandishing a weapon.

14. At this time, my goal was to detain Mr. Randall, deescalate the

3

situation and prevent any harm to the public, as it was a crowded grocery store.

15. When the suspect faced me I stated, "Hey, man, can you do me a favor and toss the knife to the side?" When I said this, he did not verbally respond. Instead, he flexed both of his arms in front of his body with his elbows slightly bent. His hands were near his waistband area, balled into fists. The stance appeared aggressive. Mr. Randall continued to hold the bottle of alcohol in his left hand and the knife in his right hand. His body language appeared as if he wanted to fight.

16. There were no customers in the aisle at the time—it was only myself, Mr. Randall and Deputy Cassidy. Deputy Cassidy and I stood next to each other.

17. I again asked him to drop the knife. Again, he did not verbally respond. He swayed back and forth in an aggressive manner. He looked agitated and the muscles in his face were flexed. He glared and me and Deputy Cassidy in an aggressive manner.

18. I asked him a third time to drop the knife, and Mr. Randall again refused. He kept flexing his arms with the knife in his hand.

19. I then commanded Mr. Randall to drop the knife at least three more times, but he refused to do so. He continued to flex his arms with the knife in his hand and stare and me and my Partner in an aggressive manner.

20. At this time, based upon his failure to comply to my many previous verbal commands and his aggressive stance, I did not believe the suspect was going to comply with my requests or commands to drop the knife. I further believed, based upon his failure to comply to my many previous verbal commands and his aggressive stance, he was could to run towards me, my Partner, or one of the many customers in the store with the knife, and severely injure someone.

21. At this point, I recommended Deputy Cassidy utilize her taser. At this moment, Deputy Cassidy and I were approximately 10 to 15 feet from Mr. Randall.

22. Deputy Cassidy fired her taser at the suspect, and the taser prongs hit Mr. Randall under his left chest and also near his right thigh. When the taser prongs

struck him, Mr. Randall dropped the bottle of alcohol but continued to hold the knife in his right hand.

23. When he was hit with the taser prongs, Randall yelled, "Fuck you."

24. While the taser prongs were in his body, I verbally commanded Mr. Randall, at least two times to, "get on the ground," but he refused to get on the ground. He removed the taser prongs from his body with his left hand.

25. Based upon my observations, the taser prongs did not physically affect Mr. Randall in any way.

26. Once he pulled the taser prongs/wires from his body, Mr. Randall ran away from Deputy Cassidy and me.

27. Given that there were many customers inside the WinCo (i.e. with the safety of the public in mind), at this time I believed there was a strong chance the Mr. Randall could stab someone with the knife. I believed this based upon his failure to respond to my many commands, his continued aggressive stance, his intoxication, the way he appeared disoriented, and the inability of the taser prongs to subdue him. Therefore, I pursued after him on foot. Deputy Cassidy also pursued him on foot.

28. He ran North down the aisle, and rounded the East corner at the end of the aisle. As he rounded the aisle I lost sight of him for a short amount of time, maybe 1 to 2 seconds.

29. When I rounded the aisle and Mr. Randall came back into my sight line, I observed Mr. Randall raising his right hand up holding the box knife and swinging the knife in a downward motion, with a forward angle. It appeared he was lunging at my partner, Deputy Cassidy. At this moment, I was approximately 5 to 8 feet from Mr. Randall, and Deputy Cassidy was closer, approximately 4 to 5 feet from Mr. Randall.

30. When I observed Mr. Randall raising his right hand up holding the box knife and swinging the knife down at a forward angle toward Deputy Cassidy, I

believed he was attempting to stab or slash her.

31. There were no customers near Mr. Randall at this moment, and I believed there was no possibility a customer would be injured if I deployed lethal force to protect Deputy Cassidy.

32. To protect Deputy Cassidy from this threat of great bodily harm, serious injury and/or death, I fired my firearm to stop Mr. Randall—to stop the threat. I believed he was going seriously injure or kill me or my Partner, Deputy Cassidy.

33. At the time, I believed I fired four to five rounds from my firearm. I fired only until I observed that Mr. Randall was no longer coming after Deputy Cassidy or myself and that he was no longer a threat.

34. Once Mr. Randall was on the ground, I holstered my firearm and placed handcuffs on him. I located gloves and immediately began to administer aid to him. Deputy Cassidy radioed for aid. Medical personnel arrived within 5 minutes to assist Mr. Randall.

35. When I deployed lethal force, Mr. Randall was armed with the knife. When I deployed lethal force, I observed Mr. Randall raising his right hand up holding the box knife and swinging the knife in a downward motion, with a forward angle. It appeared he was lunging at my partner, Deputy Cassidy. I believed Mr. Randall was attempting to stab or slash Deputy Cassidy. There were no customers near Mr. Randall at this moment, and I believed there was no possibility a customer would be injured if I deployed lethal force to protect Deputy Cassidy. I deployed lethal force to protect Deputy Cassidy from this threat of great bodily harm, serious injury and/or death—to stop the threat. I believed Mr. Randall was going to seriously injure or kill me or my Partner, Deputy Cassidy, or one of the many customers in the store.

36. In my opinion, myself and Deputy Cassidy responding on scene acted in accordance with the use of force guidelines, policies, and/or procedures of San

Bernardino County or the State of California.

37. I did not witness any acts and/or omissions by a deputy, detective, and/or officer from the San Bernardino County Sheriff's Department that I believe exceeded the scope of use of force guidelines, policies, and/or procedures of San Bernardino County or the State of California

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 20, 2025, at 1503 hours, California.

Signed by:

Cameron Stanley

WESIERSKI & ZUREK LLP
LAWYERS
29 ORCHARD ROAD
LAKE FOREST, CALIFORNIA 92630
(949) 975-1000

7
4932-8244-8139.1 SBD-00026

DECLARATION OF DEPUTY CAMERON STANLEY