LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
Renee V. Masongsong, Esq. (SBN 281819)
rvalentine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

Sharon J. Brunner, Esq. (Bar No. 229931)
sharonjbrunner@yahoo.com
LAW OFFICE OF SHARON J. BRUNNER
14393 Park Ave., Suite 100
Victorville, CA 92392
Tel: (760) 243-9997 / Fax: (760) 843-8155

James S. Terrell, Esq. (Bar No. 170409)
LAW OFFICE OF JAMES TERRELL
jim@talktoterrell.com
15411 Anacapa Rd.
Victorville, CA 92392
Tel: (760) 951-5850 / Fax: (760) 952-1085

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TODDERICK RANDALL, individually,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF SAN BERNARDINO; CORRIN CASSIDY; CAMERON STANLEY,<br><br>Defendants. | Case No. 5:24-cv-00086-SSS-SP<br>*Assigned to:*<br>Hon. Sunshine S. Sykes<br><br>**DECLARATION OF ROGER CLARK IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[*Filed concurrently with Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment; Plaintiff's Separate Statement of Facts; Declaration of Renee V. Masongsong*] |

## DECLARATION OF ROGER A. CLARK

I, Roger A. Clark, declare as follows:

1. I am an expert specializing in the procedures of police practices and proper police tactics, including proper procedures for the detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2. I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

3. My opinions are based in part on my training, professional experience, and education. I am a twenty-seven year veteran of the Los Angeles County Sheriff's Department. I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I hold a California Peace Officer Standards and Training ("P.O.S.T.") Advanced Certificate, and I am a graduate of the P.O.S.T. Command College (class #5).

4. As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the P.O.S.T. accepted investigation and apprehension methods.

5. During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. I also lectured the Reserve Academy on the P.O.S.T. syllabus: "The Legal and Moral Use of Force and Firearms."

6. During the last five and one-half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major career) criminals. I held this position until my retirement from the Department on

March 31, 1993. The majority of our cases were homicide cases. Arrests frequently occurred in dynamic circumstances including crimes in progress.

7. As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer involved shootings.

8. Since my retirement, I have testified as an expert on jail procedures and jail administration, police procedures, police tactics, investigative procedures, shooting scene reconstruction, trajectory, use of force issues, and bullet casings in Arizona State Courts, California Courts, Washington State Courts and Federal Courts in California, Texas, Colorado, Illinois, Indiana, Pennsylvania, and Washington.

9. Prior to forming my opinions in this matter, I have reviewed the scene photographs, police reports, surveillance videos from the WinCo grocery store, the transcripts of the depositions of Deputy Corrin Cassidy and Deputy Cameron Stanley, the recorded interviews of the deputies and WinCo grocery store employees, the deputies' belt recordings, the dispatch tape, and other related materials in this case.

10. **<u>Deputy Cassidy's use of the Taser was inappropriate, contrary to P.O.S.T., excessive, unreasonable, and escalated the situation</u>**.

    a. The deputies were not responding to a serious or violent crime in this case.

    b. Prior to contacting Mr. Randall, Deputies Cassidy and Stanley did not have any information that Mr. Randall had physically injured anyone.

    c. Prior to contacting Mr. Randall, Deputies Cassidy and Stanley did not have any information that Mr. Randall had verbally threatened to harm anyone.

    d. Prior to contacting Mr. Randall, Deputies Cassidy and Stanley did

-3-
DECLARATION OF ROGER CLARK

      not have any information that Mr. Randall had tried to attack anyone with the box cutter.

    e. Police officers and deputy sheriffs are trained that they should attempt to de-escalate a situation and utilize proper defusing techniques throughout an incident, particularly when dealing with a suspect who appears to be having a mental health crisis. Police officers are trained that if someone is struck by a Taser, particularly if that person is experiencing a mental health crisis, then they may run away from the Taser, which is exactly what occurred in this case. Deputies Cassidy and Stanley knew or should have known that Mr. Randall would run away from the Taser. Mr. Randall did not start to run until after he was struck by Deputy Cassidy's first Taser deployment.

    f. Prior to Deputy Cassidy's first Taser deployment, Mr. Randall did not charge or advance toward either deputy or any other person and did not try to attack any person.

    g. Mr. Randall was not in the process of attacking or attempting to attack anyone during either of Deputy Cassidy's two Taser deployments.

    h. Prior to Deputy Cassidy's second Taser deployment, Mr. Randall did not charge or advance toward either deputy or any other person. Mr. Randall ran away after the first Taser deployment and then stopped. After he stopped, Mr. Randall never took any steps toward Deputy Cassidy or Deputy Stanley. Mr. Randall was not moving forward at the time of either Taser deployment.

    i. As seen on the video, Mr. Randall did not make any slashing, swinging or stabbing motions with the box cutter prior to either of

1         Deputy Cassidy's two Taser deployments.

2   j. Mr. Randall was not within striking distance of any person at the time of either Taser deployment. At the time of the first Taser deployment, the deputies were approximately 10-15 feet away from Mr. Randall. Based on my review of the video and Deputy Stanley's deposition testimony, at the time of the second Taser deployment, Deputy Cassidy was approximately 8-10 feet away from Mr. Randall. The video shows that Deputy Stanley was further from Mr. Randall at the time of the second Taser deployment and at the time of the shooting compared to Deputy Cassidy. Based on the video and Deputy Stanley's deposition testimony placing Deputy Cassidy approximately 8-10 feet away from Mr. Randall at the time of the second Taser deployment, it appears that Deputy Stanley was approximately 10-12 feet away from Mr. Randall at the time of the second Taser deployment and at the time that Deputy Stanley started firing.

k. Police officers are trained to give a verbal warning prior to deploying the Taser against an individual, when feasible. Deputy Cassidy failed to give Mr. Randall a verbal warning prior to deploying both her first and second Taser deployments against Mr. Randall. It would have been feasible for Deputy Cassidy to give Mr. Randall a verbal warning before both her first and second Taser deployment against Mr. Randall based on the above-listed facts.

l. I have reviewed Deputy Cassidy's initial interview. In her initial interview following this incident, Deputy Cassidy never stated that Mr. Randall made any swinging, slashing, or stabbing motions

with the box cutter. I have also reviewed the transcript of Deputy Cassidy's deposition. In her deposition, Deputy Cassidy also does not state that Mr. Randall made any swinging, slashing, or stabbing motions with the box cutter.

11. **Deadly Force Applications**

   a. The use of deadly force is the most serious decision a peace officer has to make. Deadly force applied by a peace officer is force that creates a substantial risk of causing death or serious bodily injury. (*Peace Officer Standards and Training ("POST") 2020 Update, Learning Domain ("LD") 20: Chapter 4—Deadly Force, page 3*).

   b. A peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary to defend against an imminent threat of death or serious bodily injury to the officer or to another person. (*Cal. Penal Code Section 835a(c)(1)(A); POST LD 20: Chapter 4—Deadly Force, page 4*).

   c. A threat of death or serious injury is imminent when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. (*Cal. Penal Code Section 835a(e)(2)*).

   d. Deadly force can only be used on the basis of an "objectively reasonable" belief that the suspect poses an immediate threat of death or serious bodily injury. Subjective fear alone does not justify the use of deadly force. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great

      the likelihood of the harm, but is one that from appearances, must be instantly confronted and addressed. (*Cal. Penal Code Section 835a(e)(2)*).

    e. Basic police training teaches that that a suspect's failure to comply with officer commands alone is an insufficient basis for the use of deadly force.

    f. Police officers are trained that the decision to use deadly force must be guided by the reverence for human life.

    g. Pursuant to basic police training and standards, an officer must justify every shot he or she fires.

    h. Basic police training teaches that an overreaction in using deadly force is excessive force.

    12. Under the facts of this case, the officers could not justify using deadly force against Mr. Randall simply because Mr. Randall was running away and holding a box cutter, and the officers could not shoot at Mr. Randall under the fleeing felon theory. Police officers are trained that they can only shoot a fleeing felon where all of the following factors are present: (1) ". . . the subject threatens the officer with a weapon *or* there is probable cause to believe that he has committed a crime involving the infliction of serious bodily harm [or death] . . ."; (2) ". . . probable cause to believe that the subject poses a threat of death or serious physical harm, either to the officer or others . . ." (3) ". . . probable cause to believe that the use of deadly force is reasonably necessary . . ."" (4) ". . . some warning be given prior to the use of deadly force where feasible. . ." (*POST LD 20, Chapter 4, Use of Deadly Force, pages 5, 6, 11; Cal. Penal Code 835a*). These factors were not met in this case.

//

//

13. **Police officers are trained that they can only use deadly force when there is an immediate or imminent threat of death or serious bodily injury**. A reasonable police officer in the position of Deputy Stanley would not have believed that deadly force against Mr. Randall was ever justified during this incident, including because there was no immediate defense of life situation when Deputy Stanley fired his lethal shots at Mr. Randall, as follows:

   a. The deputies were not responding to a serious or violent crime.
   b. Prior to either deputy using any force against Mr. Randall, the deputies had no information that Mr. Randall had injured anyone and no information that Mr. Randall had verbally threatened anyone.
   c. The deputies had no prior contacts with Mr. Randall and no information that Mr. Randall was dangerous or violent.
   d. The deputies did not observe Mr. Randall attack or attempt to attack anyone at any time.
   e. Mr. Randall ran away from the deputies after the initial Taser deployment and never ran toward any person.
   f. Deputy Stanley knew or should have known that Mr. Randall would run away from the Taser in response to being Tased.
   g. There were no civilians in Mr. Randall's immediate vicinity at the time of the shooting.
   h. When Deputy Stanley started to fire his lethal shots, Mr. Randall was already being Tased.
   i. When Deputy Stanley fired, he was aware that there were less lethal options available. Deputy Stanley was equipped with a Taser, Deputy Cassidy had her Taser out, and Deputy Stanley was aware that Deputy Cassidy's Taser had a second cartridge.

j. At the time of the lethal shots, Mr. Randall was not moving forward.

k. At the time of the lethal shots, Mr. Randall was not making any swinging, slashing, or stabbing motions with the box cutter, he never lunged toward the deputies, and he was not in the process of attacking or attempting to attack anyone.

l. No person was within striking distance of Mr. Randall at the time of the shots. As described above, the time of the shooting, Deputy Cassidy was approximately 8-10 feet from Mr. Randall, and Deputy Stanley was approximately 10-12 feet from Mr. Randall.

m. During the shots, the distance between Deputy Stanley and Mr. Randall increased. During the shots, Deputy Stanley stepped backwards, and Mr. Randall fell backwards, away from the deputies.

n. After the shooting, the deputies were unable to locate the box cutter in Mr. Randall's immediate vicinity. Detectives ultimately found the handle of the box cutter under a display partition but did not locate any blade (RANDALL/SPD-000063). Further, one of the police reports (RANDALL/SPD-000011) indicated that, based on investigators' review of the surveillance video, Mr. Randall tossed the box cutter during or immediately after the initial Taser deployment, before the shooting.

o. Deputy Stanley did not observe the box cutter in Mr. Randall's hand when he fired at Mr. Randall while using his sights.

p. Deputy Stanley had the ability to reposition if necessary, including moving behind other grocery store aisles.

q. Deputy Stanley does not appear to have assessed between shots.

  r.  The deputies had no information about Mr. Randall's ability to understand and comply with commands and did not assess that ability.

  s.  In violation of basic police training, Deputy Stanley failed to give Mr. Randall a verbal warning that deadly force would be used prior to shooting.

  t.  Mr. Randall did not injure anyone during this incident.

14. From the standpoint of police practices and basic police training, **the use of deadly force by Deputy Stanley was contrary to POST, improper, inappropriate, excessive, and unreasonable**, including (but not limited to) for the following reasons:

  a.  <u>No crime involving the infliction of serious injury or death.</u> The officers were not responding to a serious or violent crime. They had no information that Mr. Randall had injured anyone.

  b.  <u>No Immediate Defense of Life Situation.</u> Police officers are trained that they can only use deadly force when there is an immediate or imminent threat of death or serious bodily injury. A fear of future harm is not enough. There was no immediate defense of life situation when Deputy Stanley fired his shots.

  c.  <u>Mr. Randall was experiencing a mental health crisis</u>. Officers are trained on how to handle a situation involving a person who is mentally ill or suffering from a mental health crisis, including being trained to de-escalate a situation involving a person who is experiencing a mental crisis. The deputies in this case ignored this basic police training when they escalated, rather than de-escalated, the situation involving Mr. Randall, including by Deputy Cassidy's two Taser deployments. It should have been apparent to

trained officers such as Deputy Stanley that Mr. Randall was mentally ill or experiencing a mental crisis.

d. <u>Deputy Stanley could not shoot Mr. Randall for running away</u>. Deputy Stanley could not shoot Mr. Randall for running away from the Taser or under the fleeing felon theory.

e. <u>Deputy Stanley could not shoot Mr. Randall for having a box cutter</u>. Under the facts of this case, Deputy Stanley cannot justify shooting at Mr. Randall simply because Mr. Randall had a box cutter. There must be an immediate threat of death or serious bodily injury with no other reasonable alternative measures.

f. <u>No verbal threats</u>. Mr. Randall never verbally threatened to harm anyone.

g. <u>Other reasonable alternative measures available</u>. Police officers are trained that they can only use deadly force in a "last resort" situation. Shooting was not a "last resort" in this case. Other reasonable alternative measures were available, including giving a verbal warning before using deadly force or utilizing the Taser in an appropriate manner so as not to escalate the situation, if that were necessary. At the time of the lethal shots, Mr. Randall was within the effective range of the Taser. Deputy Stanley also had OC spray on him at the time of the incident. OC spray when properly deployed would have rendered Mr. Randall blind and disoriented to provide further time for observation, tactical repositioning, and safe apprehension.

h. <u>No verbal warning regarding deadly force</u>. Police officers are trained to give a verbal warning that deadly force will be used when feasible. Deputy Stanley failed to issue a verbal warning

prior to using deadly force, even though it would have been feasible to do so under this set of facts.

    i. <u>Subjective fear is insufficient to justify using deadly force</u>. Basic police training requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." Deputy Stanley's subjective fear in shooting Mr. Randall was insufficient to justify a use of deadly force.

    j. <u>No reverence for human life</u>. Police officers are trained that they must show a reverence for human life. Deputy Stanley showed no reverence for human life when they shot Mr. Randall while he was being Tased and without issuing a verbal warning that deadly force would be used.

    k. <u>The number of shots (7) was excessive</u>. Officers are trained to reassess when they are firing lethal shots. Here, Deputy Stanley fired seven shots total. Deputy Stanley should have reassessed during his shots rather than continuing to fire. Officers are required to justify every shot they fire, and here, there is no justification for any of the shots.

    l. <u>Overreaction</u>. Police officers are trained that an overreaction I the use of deadly force is excessive force. Deputy Stanley's overreaction in shooting Mr. Randall was a use of excessive force.

**15. <u>Deputies Stanley and Cassidy engaged in improper and inappropriate tactics throughout this case.</u>**

    a. Deputies Stanley and Cassidy failed to formulate a tactical plan prior to using force against Mr. Randall.

    b. Police officers are trained to deescalate a situation with a subject.

       Deputies Stanley and Cassidy inappropriately failed to de-escalate the situation. Deputy Cassidy's two Taser deployments escalated the situation.

  c. Deputy Cassidy failed to give Mr. Randall any verbal warnings before deploying the Taser, even though it would have been feasible to do so.

  d. Deputy Stanley failed to give Mr. Randall a verbal warning that he was prepared to use deadly force before shooting Mr. Randall, despite that it would have been feasible to do so.

  e. Police officers are trained to take the background or backdrop of the shooting into consideration when using deadly force. Deputy Stanley did not take the background of the shooting into consideration when he fired his lethal shots at Mr. Randall. Two of his shots missed and struck objects in the grocery store.

  f. Police officers are trained to give clear commands. Neither deputy gave Mr. Randall any commands after Mr. Randall came back into view of the deputies, before the second Taser deployment and the shooting

  g. Deputy Stanley failed to give Mr. Randall an opportunity to comply with Deputy Cassidy's second Taser deployment before Deputy Stanley fired his weapon

  h. Under this set of facts, Deputies Stanley and Cassidy should have taken a position of cover and taken the necessary time as events unfolded for an apprehension without the use of deadly force.

Executed on March 7, 2025, at Santee, California.

_____
Roger A. Clark