EXHIBIT A

```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4    TODDERICK RANDALL, individually,     )
                                           )
 5                   Plaintiff,            )
                                           )
 6              vs.                        )Case No.
                                           )5-24-CV-00086-SSS-SP
 7    COUNTY OF SAN BERNARDINO; CORRIN     )
      CASSIDY; CAMERON STANLEY and DOES    )
 8    1-10, inclusive,                     )
                                           )
 9                   Defendants.           )
      _____)

10

11

12

13

14           REMOTE VIDEOCONFERENCE DEPOSITION OF

15                     CAMERON STANLEY

16                 FRIDAY, JUNE 14, 2024

17

18

19

20

21

22    Reported Stenographically By:

23    Jinna Grace Kim, CSR No. 14151

24    Job No.:  80214

25
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 3

```
 1     APPEARANCES OF COUNSEL:

 2

       For the Plaintiffs:
 3
               LAW OFFICES OF DALE K. GALIPO
 4             BY:  DALE K. GALIPO, ESQ.
               BY:  MARCEL F. SINCICH, ESQ.
 5             21800 Burbank Boulevard, Suite 310
               Woodland Hills, California 91367
 6             Tel:  818-347-3333
               Fax:  818-347-4118
 7             E-mail:  dalekgalipo@yahoo.com
               E-mail:  msincich@galipolaw.com
 8

 9     For the Defendants:

10             WESIERSKI & ZUREK, LLP
               BY:  BRETT SMITH, ESQ.
11             29 Orchard Road
               Lake Forest, California 92630
12             Tel:  949-975-1000
               Fax:  949-756-0517
13             E-mail:  bsmith@wzllp.com

14

15

16

17

18

19

20

21

22

23

24

25
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 13

```
 1   let me know and I'll stop so you can get it on the record.

 2           Okay?

 3           MR. SMITH:  Appreciate it.

 4           MR. GALIPO:  You're very welcome.

 5   BY MR. GALIPO:

 6       Q.   Now, you had a firearm, obviously, on you;

 7   correct?

 8       A.   Yes, sir, I did.

 9       Q.   What type of a firearm was it?

10       A.   It was a Glock 21.

11       Q.   What caliber is that?

12       A.   It's a 45.

13       Q.   Do you know now how many shots you fired?

14       A.   Yes, sir.

15       Q.   What is your understanding?

16       A.   From what I was told, I shot -- I fired seven

17   shots.

18       Q.   Did you have an impression at the time you were

19   firing how many shots you fired?

20       A.   Yes, sir.  I believed I had shot four to five

21   shots.

22       Q.   And that firearm is a semiautomatic weapon?

23       A.   Correct.

24       Q.   Essentially, you have to press the trigger for each

25   shot?
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 14

```
 1      A.   Yes, sir.

 2      Q.   Had you ever fired your firearm before the date of

 3    this incident in the line of duty, not at the firing range,

 4    but at someone?

 5      A.   No, sir.  This was my first time.

 6      Q.   Now, did you have a Taser on you?

 7      A.   Yes, sir.

 8      Q.   What type of Taser was it, if you know?

 9      A.   It was the -- I'm forgetting the brand name at the

10    moment.  I know the model was X2.

11      Q.   X2?

12      A.   Correct.

13      Q.   Okay.  I know Taser International used to make the

14    Tasers.  I don't know if they still do or not, but maybe they

15    changed their name.

16           In any event, the X2 has a separate cartridge

17    already in it so that if you fire one cartridge and you want

18    to use another one, you don't have to load it?

19      A.   Correct.  It has two separate cartridges.

20      Q.   Do you know what the length of the cartridge wires

21    are in that X2, approximately?

22      A.   Approximately 25 feet.

23      Q.   Had you ever used your Taser in the field before?

24      A.   No, sir, I have not.

25      Q.   Just in training?
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 15

```
 1      A.   Correct.

 2      Q.   Were you tased as part of your training?

 3      A.   Yes, sir, I was.

 4      Q.   And how did that feel to you?

 5      A.   Painful.

 6      Q.   Did they give you like a couple second jolt, or what

 7   was it?

 8      A.   Yes.  It was a couple second jolt, and I didn't get

 9   fully locked up how the Taser is supposed to be.  So I also

10   got drive-stunned as well in order to fully lock it up.

11      Q.   And the Taser essentially is a less-lethal option;

12   is that your understanding?

13      A.   Yes, sir --

14           MR. SMITH:  I'll insert my objection as to form.

15           But go ahead.

16   BY MR. GALIPO:

17      Q.   So let's talk a little bit about this call.

18           What general information did you have before you got

19   to the scene?

20      A.   Before I got to the scene just the broadcasted

21   information from dispatch advising that there was a black

22   male adult inside of WinCo drinking alcohol with a knife

23   exposed in his hand.

24      Q.   Did you get that information over the police

25   radio?
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 16

```
 1    A.    Correct.

 2    Q.    And were you in a unit at the time?

 3    A.    Yes, sir.

 4    Q.    Were you alone in the unit or with someone else?

 5    A.    I was alone, sir.

 6    Q.    And do you recall approximately how far you were

 7  from the location when you got that dispatch?

 8    A.    I would say approximately half a mile to a mile

 9  away.

10    Q.    Fairly close?

11    A.    Yes, sir.

12    Q.    And were you assigned to the call, or did you take

13  the call in part because you were so close?

14    A.    I wasn't assigned to it originally.

15          My partner Deputy Cassidy was, but I was currently

16  at a different call with Deputy Cassidy.  So I assisted her

17  with the call.

18    Q.    So when the call came in, you were with Deputy

19  Cassidy on another call?

20    A.    Correct.

21    Q.    Was there any other information other than what

22  you've told me so far?

23    A.    Not that I recall at the time.

24    Q.    And when you were in route to the call, did you get

25  any additional information regarding the call?
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 17

1       A.    Not that I recall at the moment.

2       Q.    For example, did you have any information that this

3    individual had physically injured anyone?

4       A.    No, sir.  We did not get that info.

5       Q.    Any information that the individual verbally

6    threatened to harm someone?

7       A.    No, sir.

8       Q.    Were you given the name of the individuals?

9       A.    No, sir.

10      Q.    You were -- it was communicated that the person was

11   African American or black?

12      A.    Yes, sir.

13      Q.    And I'm assuming at some point you and Deputy

14   Cassidy went to the scene in your separate patrol vehicles?

15      A.    Correct.

16      Q.    And at some point you entered the location?

17      A.    Yes, sir.

18      Q.    Before you entered the location did you meet with or

19   talk to anyone associated with the location outside like a

20   manager or reporting party?

21      A.    We didn't contact any of the reporting party or

22   manager until we entered the store.

23      Q.    Did you have any discussion with Deputy Cassidy as

24   to how tactically you wanted to handle the situation before

25   you entered the store?

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Cameron Stanley on 06/14/2024

Page 19

```
1    store.  I've seen the surveillance video and some still
2    photos, but what section was he walking you towards, if you
3    know?
4         A.   He was walking us towards the alcohol section which
5    is close to like the bakery area.
6         Q.   Did he say anything to you or Deputy Cassidy as he
7    was walking you in that direction?
8         A.   He walked at a pretty fast pace, and he didn't say
9    anything to us until we got closer to the subject.
10        Q.   At some point did you see the subject?
11        A.   Yes, sir.
12        Q.   And this additional information that this person
13   told you, was that before or after you saw the subject?
14        A.   It was before I saw the subject.
15        Q.   And what did the person telling additionally?
16        A.   It was the same info as the call; just that he was
17   drinking alcohol; and that he had a knife in his hand, and he
18   wanted him out of the store.
19        Q.   Anything other than that, that you could recall?
20        A.   Not that I recall, no.
21        Q.   And the person that you saw, do you generally recall
22   what he was wearing?
23        A.   If I remember correctly, it was a gray tank top and
24   black shorts, like long black shorts.
25        Q.   And any estimate as to his height or weight?
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 20

1    A.    I would say my estimate for his height was anywhere

2    between five-seven and six-foot, and his weight was

3    approximately 170 to 200 pounds.

4    Q.    And any estimate as to his age?

5    A.    From initial contact I estimated his age to be

6    around 30-years old.

7    Q.    And where was he when you first saw him in relation

8    to this alcohol, I guess, the aisle that had the alcohol?

9    A.    I would say he was approximately halfway into the

10   aisle more towards the cash register where we entered.

11   Q.    And what would you estimate the distance to be

12   between yourself and this person when you first saw them?

13   A.    Upon first contact I would estimate about 30 feet.

14   Q.    And is Deputy Cassidy near you at this point?

15   A.    Yes; sir.  We were from what I recall we were

16   side-by-side.

17   Q.    And after seeing the subject, did you and Deputy

18   Cassidy at that time discuss any tactical plan?

19   A.    Not at that time.  Due to him having an exposed

20   knife, be wanted to address the -- at least I guess I can't

21   speak for Deputy Cassidy, but my mindset was we need to

22   address the situation as fast as possible.

23   Q.    I'm just wondering, for example, was there any

24   discussion about -- strike that.

25        Did you see anything in his hands when you were

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Cameron Stanley on 06/14/2024

Page 21

1  first about 30 feet away from him?

2    A.   Yes, sir.

3    Q.   What did you see in his hands?

4    A.   There was an alcohol bottle and then a knife in his

5  hand.

6    Q.   The alcohol, could you see that readily from about

7  30 feet?

8    A.   I couldn't see what bottle it was, but I did see

9  that it was a -- looked like it could have been like a

10  margarita mix.  It was -- the liquid was yellow in color, but

11  that's all I saw from about 30 feet away.

12    Q.   I'm assuming given your age, which of course I

13  consider young because I'm so much older, but I'm assuming

14  your eyesight is pretty good as far as you know?

15    A.   Yes, sir.

16    Q.   And the lighting in the store was pretty good

17  usually.  They have -- the lights were on like they normally

18  are?

19    A.   Yes, sir.

20    Q.   And so it looked to be something similar maybe a

21  margarita mix or something similar?

22    A.   Correct.

23    Q.   And do you recall which hand he had that in?

24    A.   He had the bottle in his left hand from what I

25  recall.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Cameron Stanley on 06/14/2024

Page 22

1      Q.   Left hand.  And then did you see something in his

2   right hand when you were about 30 feet away?

3      A.   Yes, sir.

4      Q.   What did you see in his right hand?

5      A.   In his right hand I saw a knife.

6      Q.   Now, I guess it's just a matter of semantics or how

7   we want to describe stuff, but sometimes when I think of a

8   knife, I'm thinking of maybe a kitchen knife or something

9   with a blade on it and a handle.

10           And then sometimes I've seen situations where

11   someone has a box cutter.

12           Are you generally familiar with what a box cutter

13   is?

14      A.   Yes, sir.

15      Q.   Did you have familiarity with a box cutter before

16   that day?  Just generally speaking, you've seen them before

17   or maybe had occasion to use them?

18      A.   Yes, sir.

19      Q.   So this item, would you say it was a box cutter or

20   something else?

21      A.   I would say it was more of a box cutter or like a

22   construction tool knife.

23      Q.   And I guess it would have been in his right hand; is

24   that correct?

25      A.   Correct.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Cameron Stanley on 06/14/2024

Page 23

```
 1      Q.   And did it have some kind of a handle?
 2      A.   I couldn't see his handles since his hand was
 3   obviously holding the handle.
 4      Q.   And could you tell from your position whether it had
 5   a blade?
 6      A.   Yes, sir.
 7      Q.   Did it appear to have a blade?
 8      A.   Yes, sir.
 9      Q.   And how long was the blade based on your
10   observations?
11      A.   Based on my observation the blade was about an inch,
12   inch and a half.
13      Q.   And when you made this observation, I'm assuming as
14   you told me earlier Deputy Cassidy was pretty much right next
15   to you, or you were side-by-side?
16      A.   Yes, sir.
17      Q.   At that point was there any discussion with her
18   about making sure in keeping a distance from the subject?
19      A.   Not that I recall.
20      Q.   Was there any discussion about who would be assigned
21   less-lethal, for example?
22      A.   Not until we contacted the subject.
23      Q.   Was there anyone else in the aisle that you could
24   see at that time other than the subject?
25      A.   No, sir.
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Cameron Stanley on 06/14/2024

Page 24

1    Q.   And then you tried to make contact or say something

2    to him?

3    A.   Correct.

4    Q.   And tell me what you said or how you attempted to

5    make contact.

6    A.   On contact due to him having the knife, my first --

7    I asked him, "Do you mind tossing the knife to the side."

8    Q.   And how far were you from him when you said that?

9    A.   I would say about 15, 20 feet, if I recall

10   correctly.

11   Q.   So you closed the distance from 30 feet to 15 to 20

12   feet?

13   A.   Correct.

14   Q.   And that would have been after you noticed this --

15   what you've been describing as a knife in his hand?

16   A.   Correct.

17   Q.   And after you told him, "Would you mind tossing the

18   knife" or words to that effect, he still had it in his hands;

19   is that correct?

20   A.   Yes, sir.

21   Q.   And then did you give him further commands?

22   A.   Yes, sir.

23   Q.   And what were the further commands?

24   A.   I gave him additional commands to drop the knife.

25   Q.   Did you maintain this 15 or 20-foot distance, or did

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 25

1     you get a little bit closer?

2          A.    I believe I stepped a little bit closer.

3          Q.    How close do you think you got to him when you were

4     continuing to give the commands?

5          A.    I would say anywhere between ten and fifteen feet.

6          Q.    And was he still in the same general location that

7     you initially saw him?

8          A.    From what I recall, yes.

9          Q.    And do you know where Deputy Cassidy was when you

10    moved to within ten or fifteen feet of the subject?

11         A.    Yes, sir.  She was still besides me.

12         Q.    So as you moved forward, your perception was she was

13    moving forward as well?

14         A.    Correct.

15         Q.    And do you recall whether she was to your right side

16    or left side?

17         A.    She was to my right.

18         Q.    And are you right-handed or left-handed?

19         A.    Right-handed.

20         Q.    So your holster for your firearm would be on your

21    right side?

22         A.    Correct.

23         Q.    And do you keep your holster for your Taser on your

24    left side?

25         A.    Correct.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 26

1       Q.   Did you have OC spray on you at the time?

2       A.   Yes, sir.

3       Q.   And how about a police baton, did you have that?

4       A.   Yes, sir.

5       Q.   What type of police baton did you have, generally?

6            I don't need to know the make, but was it an

7    expandable baton?

8       A.   Yes, sir.

9       Q.   Do you know, was it made out of some type of a

10   metal?

11      A.   Yes, sir.

12      Q.   Based on your training with pepper spray, do you

13   have an understanding as to the range of distance you can use

14   pepper spray?

15      A.   Yes, sir.

16      Q.   What is your understanding?

17      A.   From my understanding, up to about five feet it

18   keeps its stream, but after that it expands, and it's less

19   accurate, and you're more susceptible to also betting exposed

20   to it.  So I would say about five feet.

21      Q.   So your training is it's best to use it up to five

22   feet; you can try beyond that, but it may not be effective,

23   and you can even run the risk of contamination?

24      A.   Yes, sir.

25      Q.   How about the Taser, what range of distance were you

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Cameron Stanley on 06/14/2024

Page 27

1   trained the Taser could be used in the probe or dart mode?

2       A.   From what I recall from being trained, the best

3   distance is about 15 feet because we're trained to split the

4   belt line in order to fully lock the person up.

5            And if it's too far or too close in proximity, then

6   it won't have the same effect.

7       Q.   Now, at some point just moving forward a little bit,

8   you became aware that Deputy Cassidy deployed her Taser; is

9   that correct?

10      A.   Yes, sir.

11      Q.   And if you know, did she deploy her Taser once or

12   more than once?

13      A.   I recall her just using it once at least at the

14   beginning of the incident.

15      Q.   And when she deployed it, the time you recall at the

16   beginning of the incident, what was the approximate distance

17   between her and the subject?

18            Was it about this 15 feet or more than that?

19      A.   I would approximate 10 to 15 feet.

20      Q.   When she deployed it the first time?

21      A.   Yes, sir.

22      Q.   Are you aware now at least that she deployed it a

23   second time?

24      A.   Yes, sir.

25      Q.   And are you at least aware now of when she deployed

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 28

1    it the second time?

2        A.    Yes, sir.

3        Q.    And when she deployed it the second time based on

4    what you know now, what would you estimate the distance to be

5    between her and the subject?

6        A.    I would say about eight to ten feet.

7              I'm not sure.

8        Q.    That's just an estimate?

9        A.    Yes, sir

10       Q.    Is it fair to say that it could be more than that?

11       A.    Yes, sir.  It could be more; it could be less.

12             MR. SMITH:  Just to clarify if I may, this is the

13   second deployment here we're discussing?

14             MR. GALIPO:  Yes, Brett, yeah, based on his

15   understanding now.

16             MR. SMITH:  Gotcha.

17             MR. GALIPO:  Okay.

18   BY MR. GALIPO:

19       Q.    So I guess we're up to the point -- I'm going to

20   back up a little bit now because we're up to the point where

21   you were like I guess ten or fifteen feet away giving

22   continued commands, not getting compliance; is that fair?

23       A.    Yes, sir.

24       Q.    And Deputy Cassidy is to your side, to your right?

25       A.    Yes, sir.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 29

1    Q.    And again, during this time frame if I'm

2    understanding correctly, this individual, the African

3    American individual, is in the same general location he has

4    been?

5    A.    Yes, sir.

6    Q.    Do you hear him say anything during this time

7    period?

8    A.    I did not hear him say anything until after Deputy

9    Cassidy deployed her Taser the first time.

10    Q.    Was there some discussion?  I think you alluded to

11    earlier at some point you had some tactical discussion; it

12    might have been brief, but something said between you and

13    Deputy Cassidy?

14    A.    Yes, sir.

15    Q.    Can you please tell me what that was?

16    A.    Yes, sir.  After initially contacting the subject I

17    recommended for Cassidy to take out her Taser.

18    Q.    Why did you recommend that?

19    A.    Due to two of us being there for the incident, we're

20    trained for one of us to have a lethal option to match a

21    lethal weapon, and not -- or less-lethal option if it's

22    available.

23    Q.    And in this case you were aware there was a

24    less-lethal option available?

25    A.    Yes, sir.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 30

```
 1      Q.   You also had a Taser, but in your mind, one officer

 2   should be lethal and one should be less-lethal?

 3      A.   Yes, sir.

 4      Q.   So in a way you, were designating Deputy Cassidy to

 5   be less-lethal?

 6      A.   Yes, sir.

 7           MR. SMITH:  I'll object quickly.

 8           That mischaracterizes the evidence.

 9           But go ahead, Mr. Galipo.  Sorry to interrupt.

10           MR. GALIPO:  That's okay.

11   BY MR. GALIPO:

12      Q.   Do I have that right or wrong?

13           Were you asking Deputy Cassidy to be less-lethal

14   with the Taser?

15      A.   Yes.  I recommended her to take the less-lethal

16   option out so that there was less-lethal coverage.

17      Q.   And I think you told me earlier you had some

18   training at the academy with respect to the Taser?

19      A.   Yes, sir.

20      Q.   And were you trained essentially that if it works

21   properly, the prongs if you get the appropriate spread, could

22   cause essentially muscular incapacitation for the period of

23   the cycle?

24      A.   Yes, sir.

25      Q.   And is it generally a five-second cycle?
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 31

1      A.    Yes, sir.

2      Q.    So the goal with the Taser would be to try to have

3    both prongs strike and see if you can get the spread to get

4    the muscular incapacitation.

5            Do I have that generally correct?

6      A.    Yes, sir.

7      Q.    And were you trained at the academy that a Taser can

8    be used under certain circumstances against an individual

9    that has a sharp-edged weapon?

10     A.    Yes, sir.

11     Q.    Is there anything else that you recall that either

12   you or Deputy Cassidy said to this person, the African

13   American person before Deputy Cassidy deployed her Taser

14   other than what you've told me already?

15     A.    Not that I recall.

16     Q.    Were you generally the one giving the commands?

17     A.    I believe both us were giving commands, but I do

18   believe that I commanded him to drop the knife more times

19   than Deputy Cassidy did.

20     Q.    Do you recall anything Deputy Cassidy was saying?

21     A.    I just recall her saying the same thing and

22   commanding him to drop the knife.

23     Q.    And you were told it sounds like by this store

24   employee previously that he had a knife?

25     A.    Yes, sir.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 32

1    Q.   And that was the call, also?

2    A.   Yes, sir.

3    Q.   Did Deputy Cassidy give this person a warning that

4    she was going to tase him?

5    A.   I don't recall at this time.

6    Q.   Is your training to give a warning before tasing

7    someone when feasible?

8    A.   Yes, sir.

9    Q.   Did you give him any warning he was going to be

10   tased?

11   A.   I did not, no.

12   Q.   And you're estimating that the distance between

13   Deputy Cassidy and the subject was about ten to fifteen feet

14   at the time of that initial tase?

15   A.   Approximately, yes, sir.

16   Q.   And were you aware that she was tasing him or going

17   to tase him at that time?

18   A.   Yes, sir.

19   Q.   And you were in agreement with that?

20   A.   Yes, sir.

21   Q.   Up to the tasing, so at any time before the tasing,

22   did you see this person charging at anyone?

23   A.   No, sir.

24   Q.   Did you see this person trying to attack anyone?

25   A.   No, sir.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Cameron Stanley on 06/14/2024

Page 33

1      Q.   Was the individual charging or advancing towards you

2   or Deputy Cassidy before the first Taser deployment?

3      A.   No.  He was not charging us.

4      Q.   And I think you already told me you had no

5   information that anyone had been injured or verbally

6   threatened by this person; is that correct?

7      A.   Yes, sir, that's correct.

8      Q.   Do you have some training on dealing with; people

9   that might have mental illness?

10      A.   Yes, sir.

11      Q.   I take it you thought it was a little bit odd that

12   he was in the middle of the liquor aisle with the bottle of

13   margarita mix?

14      A.   I believe anyone would think that was odd, yes.

15      Q.   I figure I get an agreement from you on that one.

16          Did you see him drinking it at all?

17      A.   While we were there, no, I did not see him drinking

18   it.

19      Q.   At the time Deputy Cassidy deployed her Taser, did

20   you have anything in your hands?

21      A.   Yes, sir.  I had my firearm in my hand.

22      Q.   And when did you unholster your firearm in the

23   sequence of events?

24      A.   Once we approached the subject I unholstered my

25   firearm.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 34

1      Q.    So when you -- I think you initially said you were

2      30 feet, and then you might have went 15 to 20, and then

3      eventually 10 to 15.

4            Do you think when you went the 15 to 20, you had

5      unholstered in that time period?

6      A.    I believe it was at some point walking up to that or

7      it could have been at the 15 to 20 feet.

8            I don't recall exactly.

9      Q.    But somewhere as you were approaching?

10     A.    Yes, sir.

11     Q.    At any time before Deputy Cassidy deployed the

12     Taser, did you believe based on your training that it was

13     appropriate to use deadly force on him?

14     A.    Can you rephrase that question?

15     Q.    Sure.  Obviously, you had training with respect to

16     deadly force; correct?

17     A.    Yes, sir.

18     Q.    And there is certain requirements based on the

19     training that have to be met to use deadly force; is that

20     generally a fair statement?

21     A.    Yes, sir.

22     Q.    I'm just wondering when he was standing there 10 or

23     15 feet away from you and not advancing, did you think in

24     your mind based on your training it would be appropriate to

25     shoot him at that point?

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 35

1      A.   If he was not advancing, then no, it would not have

2   been.

3      Q.   And I think you already answered this, but did you

4   see him advancing at any time before the Taser was

5   deployed?

6      A.   No, sir.

7      Q.   Could you tell whether the probes struck him or

8   not?

9      A.   From my point of view, they did strike him, sir.

10      Q.   And could you tell where they struck him?

11      A.   From my point of view what I observed is that one

12   struck him in the stomach area and then what it looked like

13   at least to me was that the other one struck him in his

14   right -- right thigh area.

15      Q.   And is that the type of spread that based on the

16   training is good to obtain, if you can?

17      A.   Yes, sir.

18      Q.   So I guess at least from training perspective, it

19   would have been -- the distance was good because you got both

20   probes to strike and you got the spread you want?

21      A.   Yes, sir.

22      Q.   And did you see the individual at some point try to

23   pull the probes out?

24      A.   Yes, sir.

25      Q.   Were you trained that that might be one response to

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 36

1    people being tased?

2        A.    Yes, sir.

3        Q.    And could you tell if he pulled both of them out or

4    one of them out?

5              What did it look like?

6        A.    From what I recall, I saw him grabbing what looked

7    like both wires, but I am not -- I cannot confirm that he

8    pulled the prongs out at that time.

9        Q.    And so what did he do after he was tased other than

10   attempting to put the prongs out based on your

11   observations?

12       A.    He said, quote, fuck you, and then he turned around

13   and ran away from us.

14       Q.    I'm assuming he used -- that was the first time he

15   used profanity?

16       A.    Yes, sir.

17       Q.    And that's the first time you heard him speak?

18       A.    Yes, sir.

19       Q.    And he said that after he was tased?

20       A.    Yes, sir.

21       Q.    So am I understanding correctly, that after he was

22   tased and he said, "Fuck you," instead of running towards you

23   or advancing towards you, he ran away from you?

24       A.    Yes, sir.

25       Q.    And did you give chase?

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 37

1       A.    Yes, sir.

2       Q.    And I take it he's running further down this aisle

3    generally with his back towards you?

4       A.    Yes, sir.

5       Q.    And you still have your gun out?

6       A.    Yes, sir.

7       Q.    And Deputy Cassidy, to your knowledge, has her Taser

8    out still?

9       A.    Yes, sir.

10       Q.    And to your knowledge, did she have an X2 like you

11    did?

12       A.    Yes, sir.

13       Q.    So you were aware it could fire a second

14    cartridge?

15       A.    Yes, sir.

16       Q.    Do you lose sight of the subject for a short

17    period?

18       A.    Yes, sir.

19       Q.    Is that when he got to the end of the aisle and

20    turned?

21       A.    Yes, sir.

22       Q.    And for how long of a period of time did you lose

23    sight of him?

24       A.    Honestly, in the time it felt like maybe just one

25    second.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 38

1      Q.   Were you trying to keep a safe distance from him?

2      A.   Yes, sir.

3      Q.   And what were you doing to try to keep a safe

4   distance?

5      A.   For me, we call it pieing the corner.

6           It's where you kind of keep a wide arch in order to

7   turn a corner well chasing a suspect.

8      Q.   And did you have a distance in mind that you were

9   trying to keep from him that you thought was better for you

10  tactically?

11     A.   Tactically, for me, I mean I would have chosen

12  probably about over 20, 21 feet.

13     Q.   And is that what you were trying to do, keep a

14  distance of 20 or 21 feet?

15     A.   I was trying to, yes, sir.

16     Q.   Did you have the impression that Deputy Cassidy was

17  also trying to do that?

18     A.   Seeing that she stood or stayed pretty close to my

19  proximity, I could assume, but I could not speak on her

20  behalf.

21     Q.   But as you approached, she was in close proximity to

22  you?

23     A.   Yes, sir.

24     Q.   Still generally on your right side?

25     A.   On my right side, yes, sir.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 39

1    Q.   And did you think it was appropriate based on your

2    training to shoot this individual as he was running away from

3    you down the aisle before you lost sight of him?

4    A.   If he was just running down, I would not have

5    shot.

6    Q.   And did you see anyone else in the aisle at that

7    point?

8    A.   No, sir.

9    Q.   And do you have an estimate as to how far he ran

10   before he went out of your view?

11   A.   I could estimate, but I'm not sure exactly.

12   Q.   Just give me an estimate.  You can even give me a

13   range if you want.  Like 40 to 80 feet, whatever you're

14   comfortable with.

15   A.   I would say those aisles are pretty long.

16        I mean it could be anywhere between -- I mean I'm

17   not really good with measuring distance like that, but I

18   would say anywhere between a 100 -- I would say about 75 to

19   125 feet.

20   Q.   And do you know for how long he was running away

21   from you before he went out of your view?

22   A.   I do not know how long.

23   Q.   But you believe when he did go out of your view, it

24   was like a second or so?

25   A.   Yes, sir.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Cameron Stanley on 06/14/2024

Page 40

1    Q.   And how would you describe the gait you were moving

2    forward?

3          Were you walking, walking fast, jogging, sprinting,

4    whatever words you want to use.

5    A.   I would say it was a mix between -- so I thought I

6    heard something.

7          Did someone else talk?

8    Q.   I thought I heard something too, but I think we're

9    okay.

10   A.   Okay.  I would say it was somewhere between walking

11   fast and jogging.

12   Q.   And at some point does he come in your view again?

13   A.   Yes, sir.

14   Q.   And how much time would you say passed from the

15   subject coming in your view again and you firing your first

16   shot?

17   A.   I would say within a second.

18   Q.   Did you give him any verbal warning that you were

19   going to fire?

20   A.   No, sir, I did not.

21   Q.   Did you give him any commands after seeing him again

22   before firing?

23   A.   Not that I recall, no.

24   Q.   How far would you estimate he was from you at the

25   time you fired?

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 41

```
 1      A.   I would say between five and eight feet, I believe.

 2           I don't recall completely.

 3      Q.   That's your best estimate?

 4      A.   Yes, sir.

 5      Q.   And was that the distance he was from you when he

 6   came into your view again?

 7      A.   Yes, sir.

 8      Q.   And was that also about the distance he was from you

 9   when you fired?

10      A.   Yes, sir.

11      Q.   And did you advance any further towards him after he

12   came in your view again?

13      A.   No, sir.

14      Q.   Did you try to retreat at all or create distance

15   before you fired?

16      A.   I believe as soon as I perceived the threat, I

17   fired, and then I back-stepped after the fact that I fired my

18   first shot.

19      Q.   So you might have been stepping back as you were

20   firing?

21      A.   From what I recall, it's a possibility, yes.

22      Q.   And Deputy Cassidy, you think would have been to

23   your right when you fired?

24      A.   Yes, sir.

25      Q.   And do you believe at least now that she deployed
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Cameron Stanley on 06/14/2024

Page 42

```
 1    her Taser very close in time to when you fired your

 2    firearm?

 3         A.   Yes, sir.

 4         Q.   From the time you saw him again at this approximate

 5    distance you're talking about, five to eight feet, did he

 6    advance again towards you?

 7         A.   Yes.  From my point of view it appeared he was

 8    advancing towards us.

 9         Q.   Was he running towards you?

10         A.   From what I recall, we turned the corner, and he was

11    standing there like a bladed stance with his hand up and the

12    knife in his hand.

13              So maybe not necessarily approaching us, but he was

14    like in an attack position.

15         Q.   Was he generally in a stationary position when you

16    turned the corner?

17         A.   I don't know if he was stationary, but it's kind

18    of -- it all happened so quick.  It's kind of hard to tell.

19         Q.   Was he in the same position he was when you turned

20    the corner and saw him as he was when you fired your first

21    shot?

22         A.   No, sir.

23         Q.   His position changed?

24         A.   Yes, sir.

25         Q.   And how did it change?
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 43

```
1        A.   From what I recall, he had his hand up in the air,

2   and his hand was coming down as in a slashing or stabbing

3   motion.

4        Q.   Do you know now whether he was reacting to the

5   second Taser by Deputy Cassidy?

6        A.   I can't speak for him, so.

7        Q.   Was there any warning that the Taser was going to be

8   deployed again?

9        A.   Not that I recall, no.

10       Q.   So I guess what I'm wondering, I understand that his

11   arm movement changed as you described, but I guess what I'm

12   wondering, was he running in your direction at the time you

13   fired the shots?

14       A.   Was he running, not from what I saw, no.

15       Q.   Was he jogging or walking quickly in your direction

16   when you fired?

17       A.   Not that I recall, no.

18       Q.   Was he stepping, taking two, three, four, five steps

19   in your direction before you fired?

20       A.   Not from what I recall, no.

21       Q.   Okay.

22            MR. GALIPO:  We've been going about an hour.

23            Is this a good time for everyone to take a

24   ten-minute break?

25            MR. SMITH:  Yes, sir.  It's good for me if it's okay
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 44

```
 1   for you, Deputy, and Ms. Kim, of course.

 2              (Recess taken.)

 3   BY MR. GALIPO:

 4       Q.   Is it correct that prior to the individual running

 5   away from you and Deputy Cassidy, he never advanced towards

 6   you; is that correct?

 7       A.   Yes, sir.

 8       Q.   And after he was tased, he ran way from you?

 9       A.   Yes, sir.

10       Q.   So I'm going to show a few exhibits.

11              We're going to try to share screen.  Sometimes this

12   works; sometimes it doesn't, but we're going to try to put an

13   image on the screen, and I'll mark the first one as Exhibit

14   1.

15              I'll make sure my office e-mails these to defense

16   counsel and our court reporter after the depo.

17              But can you see this image an your screen?

18       A.   Yes, sir.

19              (Exhibit 1 was marked for identification.)

20   BY MR. GALIPO:

21       Q.   And I would submit to you that I believe this is a

22   like a still image from the surveillance video; is that what

23   it looks like to you?

24       A.   Yes, sir.

25       Q.   And in this image I'm assuming we can see yourself
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 45

```
 1   and Deputy Cassidy in uniform?

 2        A.   Yes, sir.

 3        Q.   And the African American gentleman, we can see him

 4   towards the center of the aisle; is that correct?

 5        A.   Yes, sir.

 6             MR. SMITH:  If I could inject one moment.

 7             Mr. Galipo, are you able to read the time signature

 8   there on the bar on the left?  I think that would be --

 9             MR. GALIPO:  Yeah.  I think that's a good idea,

10   Brett.  My eyes are not what they used to be, but Renee maybe

11   can help me out with this.

12             MR. SMITH:  Right at ten minutes?

13             MS. MASONGSONG:  That's what I'm reading as well.

14             Zero and ten minutes.

15             MR. SMITH:  Okay.  Appreciate it.

16             MR. GALIPO:  Not a problem.  We'll also attach these

17   and also send you a copy right after the depo.

18             MR. SMITH:  Sounds great.  I'll bite my tongue.

19             MR. GALIPO:  Okay.  I don't want you to do that.

20             That could hurt.

21   BY MR. GALIPO:

22        Q.   And so up to the point in time that we see in

23   Exhibit 1, he is not advancing towards you or trying to

24   attack you with the box cutter; is that correct?

25        A.   Correct.
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Cameron Stanley on 06/14/2024

Page 46

1    Q.    And is that generally where you recall him

2    positioned in the aisle when you saw him at this point?

3    A.    Yes, sir.

4    Q.    And what would you estimate your distance from him

5    at this point just from looking at this image?

6    A.    I would still say my estimate is still 15 to 20 feet

7    at that point.

8    Q.    And do you have any training that you should keep

9    more than 21 feet from someone with an edged weapon?

10    A.    Yes, sir.

11    Q.    But you're saying at this point you're 15 to 20

12    feet?

13    A.    Yes, sir.  Approximation.

14    Q.    Okay.

15        MR. GALIPO:  Let's look at Exhibit 2, please.

16        (Exhibit 2 was marked for identification.)

17        MR. GALIPO:  Renee, can you see the --

18        MS. MASONGSONG:  Yes.  The time stamp from the video

19    itself is ten minutes and six seconds, and that's into the

20    video, and then the time stamp from the surveillance video

21    directly is looks like 12:00 p.m. and ten minutes in the

22    bottom left-hand corner.

23        MR. SMITH:  Thank you.

24        MR. GALIPO:  So this image in Exhibit 2, I don't

25    know if we can enlarge is slightly, but -- I think we're

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Cameron Stanley on 06/14/2024

Page 47

 1    cutting off part of it.

 2              I think that's better.  Just leave it like that.

 3              That's fine.

 4    BY MR. GALIPO:

 5        Q.    Again, you could see yourself and Deputy Cassidy

 6    and the African American gentleman?

 7        A.    Yes, sir.

 8        Q.    And can you see the blade in this image as you look

 9    at it?

10        A.    Yes, sir.

11        Q.    And how far do you think you are from him at this

12    point?

13        A.    I would estimate ten to fifteen feet.

14        Q.    And can you tell or do you know whether he's been

15    tased yet?

16        A.    I don't believe he's been tased yet.

17        Q.    Okay.

18              MR. GALIPO:  Let's look at Exhibit 3.

19              (Exhibit 3 was marked for identification.)

20              MS. MASONGSONG:  The time stamp on this appears to

21    be ten minutes and fifteen seconds into the video itself and

22    12:10 and 25 seconds p.m. in realtime.

23              MR. GALIPO:  Thank you, Renee.

24    BY MR. GALIPO:

25        Q.    And what would you estimate the distance here

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 48

```
 1   between him and yourself?

 2       A.   I would still say ten to fifteen feet.

 3       Q.   And you told me earlier you did not think it was

 4   appropriate to shoot him at this point; correct?

 5       A.   No, sir.

 6       Q.   Is that correct?

 7       A.   Sorry.  Yes, sir, it's correct.

 8       Q.   That's okay.  And can you tell whether he was tased

 9   at this point or not?

10       A.   Based on the imaging it appears that he was at this

11   point.

12       Q.   And do you remember him reacting in some fashion to

13   being tased?

14       A.   Yes, sir.

15       Q.   And were you trained that sometimes people who are

16   tased may react to it?

17       A.   Yes, sir.

18       Q.   Probably trained that different people react

19   differently; is that fair?

20       A.   Yes, sir.

21       Q.   And then Exhibit 4.

22            (Exhibit 4 was marked for identification.)

23            MS. MASONGSONG:  For the record, the time stamp is

24   ten minutes and 22 seconds and in realtime that's 12:10 p.m.

25   and 30 seconds.
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 49

1              MR. GALIPO:  Thank you, Renee.

2     BY MR. GALIPO:

3          Q.   Is this image capture a point in time that you

4     described earlier when he's running away from you?

5          A.   Yes, sir.

6          Q.   And when he was running away, did he still have the

7     margarita mix in his left hand?

8          A.   It looks like it, yes, sir.

9          Q.   And you believe he still had the box cutter in his

10    right hand?

11         A.   Yes, sir.

12         Q.   And you believe there was a blade protruding from

13    the box cutter?

14         A.   Yes, sir.

15         Q.   Are you aware that after the incident the box cutter

16    was found with no blade?

17             MR. SMITH:  I'll object that that mischaracterizes

18    evidence and to the form of the question.

19             But go ahead, Deputy Stanley.

20             THE WITNESS:  I was not aware that it was found with

21    no blade.

22    BY MR. GALIPO:

23         Q.   And what would you estimate your distance between

24    you and the individual in this image?

25         A.   From that image I would say -- hard to tell on the

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 51

1  realtime is 12:10 p.m. and 34 seconds.

2          (Exhibit 6 was marked for identification.)

3  BY MR. GALIPO:

4      Q.   Okay.  It appears that the subject that was running

5  away is no longer at least in this image, would you agree?

6      A.   Yes, sir.

7      Q.   And is this time period when the subject went out of

8  your view?

9      A.   Yes, sir.

10      Q.   Now, you talked about pieng the corner.

11          Does that mean approaching the corner slowly just to

12  make sure you can maintain safer distance?

13      A.   The way I described it was like kind of arching the

14  corner and not following in the direct path of the subject

15  just in case they were lying in wait.

16      Q.   Okay.

17          MR. GALIPO:  Exhibit 7, please.

18          (Exhibit 7 was marked for identification.)

19          MS. MASONGSONG:  This is -- ten minutes and 29

20  seconds or 12:10 p.m. and 35 seconds.

21  BY MR. GALIPO:

22      Q.   If you could tell, do you believe you were shooting

23  at this point?

24      A.   Yes, sir.

25      Q.   And you could see Deputy Cassidy to your right?

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 53

1    A.    From my knowledge, I believe so.

2    Q.    And you told me your understanding now is she tased

3    him when he was at the end of the aisle a second time?

4    A.    I believe it was about the same time that I fired my

5    first shot, yes, sir.

6    Q.    And does this look to be the time frame where Deputy

7    Cassidy tased him?

8    A.    Yes, sir.

9          MR. SMITH:  I guess I'll interpose my objection.

10         Assumes facts not in evidence.

11         But go ahead.

12         MR. GALIPO:  Okay.  Exhibit 9, please.

13         (Exhibit 9 was marked for identification.)

14         MS. MASONGSONG:  This is seven seconds into this

15   video, and the time stamp in the bottom left-hand corner is

16   12:10 p.m. and 41 seconds.

17   BY MR. GALIPO:

18   Q.    Do you recall during the shooting sequence that the

19   subject was moving away from you?

20   A.    I don't recall.  It appears that he's falling.

21   Q.    Okay.

22         MR. GALIPO:  Exhibit 10.

23         (Exhibit 10 was marked for identification.)

24         MS. MASONGSONG:  This is seven seconds into the

25   video, and the time stamp is 12:10 and 41 seconds in the

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Cameron Stanley on 06/14/2024

Page 56

```
 1              I'm trying to get what part of the body you were

 2   aiming at.

 3        A.   I was aiming at the -- I could never say it, but the

 4   upper thoracic.

 5        Q.   Thoracic?

 6        A.   Yeah, thoracic.

 7             It's like more so the sternum.

 8        Q.   Kind of the middle, the separation between the chest

 9   and the abdomen?

10        A.   Yes, sir.

11        Q.   Kind of like in the middle of the chest where I'm

12   pointing at the top of my vest line?

13        A.   Yes, sir.

14        Q.   And obviously, you were trained that shooting

15   someone in that area could cause serious injury or death; is

16   that fair?

17        A.   Yes, sir.

18        Q.   Now, so he fell backwards, not forwards; is that

19   correct?

20        A.   Yes, sir.

21        Q.   And did he seem to be moving away from you during

22   the shooting sequence?

23        A.   Not when I started firing, no.

24        Q.   But during the shots?

25        A.   I don't recall.
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 57

1    Q.    What did you do immediately after the shooting?

2    A.    Immediately after the shooting I no longer saw the

3    box cutter in his hand.  So I unholstered my firearm; I

4    detained him, and I did not have gloves on my person, so I

5    asked the bakery workers if they could provide me with gloves

6    so I can render medical aid.

7    Q.    Did you look for the box cutter?

8    A.    I did not, no.

9    Q.    Did you see it anywhere around his person?

10   A.    I did not, no.

11   Q.    How about the this margarita mix, did he have that

12   on him?

13   A.    Honestly, sir, I don't recall.

14   Q.    So are you saying that very soon after the shots,

15   you approached him and to see where the box cutter was, and

16   you didn't see a box cutter?

17   A.    I did not see a box cutter immediately in his person

18   which is the only area that I looked because I was more

19   worried about rendering medical aid to him than locating the

20   box cutter.

21         Once my partners arrived I was taken away from the

22   scene.  So I never got a chance to look for the box cutter.

23   Q.    How long were you in the store after the shooting

24   before you were taken away?

25   A.    My sergeant arrived I would say within a minute and

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 58

```
 1   a half, and he took me away from the scene.
 2        Q.   And during that approximate minute and a half, did
 3   you see the box cutter anywhere?
 4        A.   I wasn't looking, sir.  I was only trying to
 5   evaluate the subject, and I was rendering medical aid, and I
 6   was essentially sticking my finger in the wounds.
 7        Q.   When you got into a shooting stance and were using
 8   your sights as you described, could you see the box cutter at
 9   that time as you were firing those shots?
10        A.   From what I recall, I fired until I did not observe
11   a threat anymore.
12        Q.   I get that.  I'm asking you something more specific.
13             When you were up on your sights, could you see the
14   box cutter?
15        A.   I don't recall at this moment.
16        Q.   Do you know specifically where the box cutter was
17   during your, let's say, your last group of shots?
18        A.   What do you mean by last group?
19        Q.   Well, you had seven shots; right?
20        A.   Correct.
21        Q.   It sounds like the first shot or two was more point
22   shooting, and then you came up on your sights in two hands.
23        A.   Yes, sir.  But it was all one sequence.
24        Q.   Right.  But I'm talking about the shots when you
25   came up on your sights, could you see the box cutter at that
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 59

1    point?

2        A.    Not while I was looking through my sights, no.

3        Q.    And did he ever appear to attempt to throw the box

4    cutter at you?

5        A.    Could have been a possibility based on his bladed

6    stance, but I can't say for sure.

7        Q.    I'm just wondering if it's something you saw.

8             Did you ever see him throwing the box cutter at you?

9        A.    No, sir, I did not see that.

10       Q.    And it sounds like when you came around the corner,

11   you saw him in a bladed stance; is that correct?

12       A.    Yes, sir.

13       Q.    But you agree he did not advance towards you in the

14   aisle that you were in?

15            MR. SMITH:  I'll object that that misstate prior

16   testimony.

17            But go ahead, Deputy Stanley.

18            THE WITNESS:  I think that's kind of a hard question

19   to answer because even though he was in a bladed stance and

20   he was stationary, what it seemed stationary, he still

21   appeared to advance towards us by the motion of his arm.

22            But no, he did not take steps towards us.

23   BY MR. GALIPO:

24       Q.    Did you know when you were chasing him that Deputy

25   Cassidy still had the Taser?

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Cameron Stanley on 06/14/2024

Page 60

1      A.    I wasn't paying attention to what was in Deputy

2    Cassidy's hand at that time.  So no, I was unaware.

3      Q.    But you never told her to put the Taser away, did

4    you?

5      A.    No, sir.

6      Q.    And you were aware that the she had deployed it

7    once?

8      A.    Yes, sir.

9      Q.    You were aware at least because it's an X2; it has a

10    second cartridge?

11      A.    Sorry, sir.  You cut out for a second.

12      Q.    I'm sorry.  You were aware because it was an X2, it

13    had a second cartridge?

14      A.    Yes, sir.

15      Q.    Where did you go from the scene?

16      A.    From after the incident was done, I was brought back

17    to the Victorville Police Station to the conference room.

18      Q.    And how long were you in the conference room for?

19      A.    From what I recall, maybe two, three hours.

20      Q.    Did anyone come to talk to you while you were in the

21    conference room?

22      A.    Just the captain spoke to myself and Cassidy, not

23    about the incident, but just making sure we were okay.

24      Q.    And were you in the conference room with Deputy

25    Cassidy?

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Cameron Stanley on 06/14/2024

Page 61

1      A.   Yes, sir.

2      Q.   And so the majority of the time you were in the

3  conference room together without the captain?

4      A.   I don't recall.

5      Q.   You don't recall what part?

6      A.   I don't recall how long the captain was in there for

7  afterwards.  The whole thing was kind of a blur.

8      Q.   Right.  But is it correct to say when the captain

9  was not in the room, it was just you and Deputy Cassidy?

10     A.   Yes, sir.

11     Q.   Now, you mentioned -- did you observe some wounds on

12  the person you shot?

13     A.   Yes, sir.

14     Q.   Where did you observe the wounds?

15     A.   I believe I observed three wounds from while I was

16  there.  One was in his arm; one in his shoulder; and one hit

17  his stomach.  I don't recall any other ones.

18     Q.   Was he making some type of noises indicating to you

19  he was in pain?

20     A.   Yes, sir.

21     Q.   Did he say anything to you after the shooting?

22     A.   Not that I recall.

23     Q.   Did you say anything to Deputy Cassidy after the

24  shooting, but before you left the store?

25     A.   I remember making sure she was okay because she

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 64

1      Q.   And what could you see in watching the video that

2   led you to believe she deployed the Taser a second time?

3      A.   I don't recall.

4      Q.   Was it the darts or the reaction, or do you recall

5   what it was?

6      A.   I believe the reaction.

7      Q.   Did you ever watch the video with Deputy Cassidy

8   present?

9      A.   Yes, sir.

10     Q.   There's just going to be a few pauses now because

11  I'm looking at the transcription of your interview, and a lot

12  of this we already covered.  So bear with me.

13          Okay?  We're getting close to the end.

14     A.   Okay, sir.  No problem.

15     Q.   Do you remember hearing even after your gunshots the

16  Taser cycle still going when you watched the video or

17  listened to the audio?

18     A.   I don't recall at this moment.

19     Q.   Is it generally a five-second cycle?

20     A.   Yes, sir.

21     Q.   So at least from what you know now, you believe the

22  subject was being tased and shot at the same time?

23          MR. SMITH:  I'm going to object that that misstates

24  prior testimony.

25          But go ahead, Deputy Stanley.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 65

```
 1   BY MR. GALIPO:

 2        Q.   You may answer.

 3        A.   Yes, sir.  However, I do not know if those darts

 4   actually made contact.

 5        Q.   You mentioned in your interview that after the

 6   incident when you approached him, you didn't see the knife in

 7   his hand anymore, and you couldn't locate the knife.

 8             Do you remember saying that?

 9        A.   I did not locate it near him.

10        Q.   Well, you didn't locate it anywhere, did you?

11        A.   Not that I saw, no.

12        Q.   And you described that he was bleeding heavily in

13   your interview.

14             Do you recall that?

15        A.   Yes, sir.

16        Q.   And you were trying to do what could do to stop the

17   heavy bleeding?

18        A.   Yes, sir.

19        Q.   The first time the Taser was deployed, I think you

20   already told me; you saw the probes strike him?

21        A.   Yes, sir.

22        Q.   As you were -- it sounds like when you started

23   firing, you were estimating the distance to be five to eight

24   feet; is that correct?

25        A.   From my recollection, yes, sir.
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Cameron Stanley on 06/14/2024

Page 66

1    Q.   But it also sounded like you were stepping backward

2    as you were firing?

3         A.   Yes, sir.

4    Q.   And it appears that he was falling away from you at

5    some point during the shooting sequence?

6         A.   Yes, sir.

7    Q.   So was the distance between you and him increasing

8    during the shooting sequence because you were stepping back,

9    and he was falling away?

10        A.   I would say so, yes, sir.

11   Q.   When you rounded the corner, did you see any other

12   customers in the store that were nearby you or the African

13   American gentleman?

14        A.   Not that I observed, no.

15   Q.   So once you saw him again after you turned the

16   corner, you didn't give commands or a verbal warning; your

17   reaction was to point shoot?

18        A.   Yes, sir.

19   Q.   Did you see him pulling the wires out after the

20   first Taser deployment?

21        A.   That's what it appeared, yes, sir.

22   Q.   Did he have the box cutter in his hand at that

23   point?

24        A.   From what I observed, yes, sir.

25   Q.   Now, your training on deadly force, I'm assuming you

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 67

1    were trained it's the highest level of force an officer can

2    use; correct?

3         A.    Yes, sir.

4         Q.    And you were trained that it is -- shooting someone

5    center mass is likely to cause death or serious bodily

6    injury?

7         A.    Yes, sir.

8         Q.    And you were essentially trained that an officer can

9    use deadly force if there is an imminent or immediate threat

10   of death or serious bodily injury to yourself or others?

11        A.    Yes, sir.

12        Q.    But you're also trained that if there is not an

13   imminent threat or immediate threat of death of serious

14   bodily injury, then you should not use deadly force; is that

15   fair?

16        A.    Yes, sir.

17        Q.    You should also consider other reasonable options?

18        A.    Yes, sir.

19        Q.    You should give a verbal warning that you're going

20   to use deadly force when feasible?

21        A.    When feasible, yes, sir.

22        Q.    And you should do your best to assess, both before

23   shooting and during the shooting sequence, if you can?

24        A.    Yes, sir.

25        Q.    The training is you have to justify each shot; is

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 68

1    that correct?

2         A.   Yes, sir.

3         Q.   And you should consider among other factors your

4    background or backdrop?

5         A.   Yes, sir.

6         Q.   Did you know what was in your background or backdrop

7    in this store when you were firing?

8         A.   Yes, sir.

9         Q.   What did you believe was in your backdrop?

10        A.   From what I observed, it had was pellets of -- it

11   looked like soda bottles, and then the back wall of the store

12   is made out of cinder blocks.

13        Q.   I take it that you've been trained that bullets

14   could hit things and ricochet?

15        A.   Yes, sir.

16        Q.   Do you know how many of your seven shots struck

17   Mr. Randall?

18        A.   I believe I was told it was five out of seven.

19        Q.   Two of them missed as you understand it?

20        A.   From what I understand, yes.

21        Q.   Do you have any understanding as to where those two

22   shots that missed him went?

23        A.   No, sir, I do not.

24        Q.   As part of your training were you trained that Penal

25   Code Section 835 has been amended to include some new

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 69

1   language including when you can use deadly force?

2        A.    Can you repeat that, sir?

3        Q.    Sure.  Penal Code Section 835 was amended in the

4   last couple of years, and it talks about someone having the

5   ability, the opportunity, the intent.

6             Do you recall any language like that in your

7   training?

8        A.    From what I recall, yes, sir.

9        Q.    And if you're not sure, it's okay.  I don't want you

10  to feel like you have to agree with me just because I'm

11  saying it.

12            I'm just wondering whether you recall being trained

13  on the revisions to the deadly force standards and that Penal

14  Code Section.

15       A.    Yes, sir.  We were trained on the deadly force

16  standards.

17       Q.    Were you trained that it has to be imminent or

18  immediate to use deadly force?

19       A.    Yes, sir.

20       Q.    And were you trained that the threat level has to be

21  of death or serious bodily injury?

22       A.    Yes, sir.

23       Q.    And were you trained that fear of future harm, no

24  matter how likely or how great the fear, is insufficient to

25  use deadly force?

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Cameron Stanley on 06/14/2024

Page 70

1      A.    Yes, sir.

2      Q.    Okay.

3            MR. GALIPO:  I think we can take our last ten-minute

4    break.  I'll come back and I'm confident I'll finish within

5    ten minutes of our return.

6            MR. SMITH:  Okay.  We can go off the record now.

7            (Recess taken.)

8    BY MR. GALIPO:

9      Q.    When he was running away from you, I take it you

10   didn't want him to run away from you; is that fair?

11     A.    No.  The best outcome would have been if he complied

12   and dropped the knife.

13     Q.    But once he started running away, did you want him

14   to stop running?

15     A.    Yes, sir.

16     Q.    And did you try to tell him to stop or words to that

17   effect?

18     A.    I don't recall.  I don't believe so.

19     Q.    Do you know if Deputy Cassidy told him to stop or

20   stop running?

21     A.    I don't recall.

22     Q.    I mean your plan wasn't if he stops running, you're

23   going to shoot him automatically, is it?

24     A.    No, sir.

25     Q.    In some of the investigation reports, it references

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cameron Stanley on 06/14/2024**

Page 74

```
 1                      CERTIFICATE

 2                          OF

 3          CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5          I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8          That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10          That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12          That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15          Further, that the foregoing is an accurate

16   transcription thereof.

17          I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21          IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  June 14, 2024.

23

24          _____
            Jinna Grace Kim, CSR No. 14151

25
```