EXHIBIT B

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Corrin Cassidy on 06/14/2024

```
 1                 UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   TODDERICK RANDALL, individually,    )
                                         )
 5                 Plaintiff,            )
                                         )
 6                 vs.                   )Case No.
                                         )5-24-CV-00086-SSS-SP
 7   COUNTY OF SAN BERNARDINO; CORRIN    )
     CASSIDY; CAMERON STANLEY and DOES   )
 8   1-10, inclusive,                    )
                                         )
 9                 Defendants.           )
     _____)

10

11

12

13

14          REMOTE VIDEOCONFERENCE DEPOSITION OF

15                     CORRIN CASSIDY

16                 FRIDAY, JUNE 14, 2024

17

18

19

20

21

22   Reported Stenographically By:

23   Jinna Grace Kim, CSR No. 14151

24   Job No.:  80214

25
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

```
 1     APPEARANCES OF COUNSEL:

 2

       For the Plaintiffs:
 3
               LAW OFFICES OF DALE K. GALIPO
 4             BY:  DALE K. GALIPO, ESQ.
               BY:  MARCEL F. SINCICH, ESQ.
 5             21800 Burbank Boulevard, Suite 310
               Woodland Hills, California 91367
 6             Tel:  818-347-3333
               Fax:  818-347-4118
 7             E-mail:  dalekgalipo@yahoo.com
               E-mail:  msincich@galipolaw.com
 8

 9     For the Defendants:

10             WESIERSKI & ZUREK, LLP
               BY:  BRETT SMITH, ESQ.
11             29 Orchard Road
               Lake Forest, California 92630
12             Tel:  949-975-1000
               Fax:  949-756-0517
13             E-mail:  bsmith@wzllp.com

14

15

16

17

18

19

20

21

22

23

24

25
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 8

1    patrol?

2        A.    Yes, sir.

3        Q.    And you had a period of field training?

4        A.    I did.

5        Q.    And when did the field training end,

6    approximately?

7        A.    I want to say February of 2022, I believe.

8        Q.    And the incident that we're here it talk about, it's

9    my understanding that you deployed your Taser twice?

10        A.    Yes.

11        Q.    Was that an X2?

12        A.    Yes.

13        Q.    And do you recall the date of that incident?

14        A.    I believe it was sometime in August of 2022.

15        Q.    So had you been off of field training for about six

16    months?

17        A.    I believe.  But I don't want to give an exact answer

18    because I can't quite recall.

19        Q.    Okay.  Well, I'm not expecting exact answers.

20            Are these like estimates?

21        A.    Yes.

22        Q.    Okay.  Do you know the person's name now to be

23    Mr. Randall?

24        A.    I do.

25        Q.    Prior to the incident with Mr. Randall, had you ever

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Corrin Cassidy on 06/14/2024

Page 9

1    seen a suspect with a knife in their hand before?

2        A.    Yes.

3        Q.    And on how many prior occasions?

4        A.    Maybe two to three.

5        Q.    Were you trained that you could tase someone just

6    for seeing a knife in their hand, that fact alone?

7        A.    Not that fact alone.

8        Q.    Were you trained that you could use lethal force on

9    someone just for seeing a knife in their hand?

10       A.    Not that fact alone.

11       Q.    Had you ever seen a suspect with a gun in their

12   hand?

13       A.    Before -- since before that incident?

14       Q.    Yes.

15       A.    No.

16       Q.    How about a box cutter, had you ever seen anyone

17   with a box cutter before in their hand?

18       A.    Before that incident, no.

19       Q.    Did you know what a box cutter generally was before

20   the incident with Mr. Randall?

21       A.    Yes.

22       Q.    What type of information did you generally have

23   related to the call?

24       A.    Sorry.  You cut out a little bit.

25       Q.    I'm sorry.  With Mr. Randall, what type of

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 11

1    A.    Yes.

2    Q.    What other information did you receive?

3    A.    The reporting party met with us outside.

4          He appeared pretty frantic, and was like showing us

5    to where Randall was located.  I verified with him before I

6    even observed Randall; that he did not want him there; he

7    confirmed he did not want him there, and basically pointed to

8    the alcohol aisle.

9    Q.    And then at is that point you see Randall in the

10   alcohol aisle?

11   A.    Correct.

12   Q.    Did anyone tell you before you saw Randall that he

13   had injured anyone?

14   A.    No.

15   Q.    Did anyone tell you he tried to attack anyone with a

16   knife?

17   A.    No.

18   Q.    Did anyone tell you that he had verbally threatened

19   to harm anyone?

20   A.    No.

21   Q.    Had you ever seen Mr. Randall before?

22   A.    No.

23   Q.    At some point you tased Mr. Randall; is that

24   correct?

25   A.    Yes.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 12

1    Q.   And was it your idea to tase him, or was that

2    something you discussed with Deputy Stanley?

3    A.   It was a very brief discussion with Stanley.

4    Q.   What do you recall about that brief discussion?

5    A.   I observed -- I could see he had lethal coverage,

6    and he basically said, hey, you want to get Taser, and I was

7    like, yep, and then that was it.

8    Q.   Had you deployed your Taser in the field before that

9    day?

10   A.   Yes.

11   Q.   On how many prior occasions?

12   A.   Maybe five to six times.

13   Q.   And had you used it in the probe mode before?

14   A.   Yes.

15   Q.   The dart mode or probe mode, I call it?

16   A.   Yes.

17   Q.   And has it generally been effective in the past?

18   A.   Yes.

19   Q.   Had you ever used it against a suspect with a knife

20   in they're hand before?

21   A.   Not at that time, no.

22   Q.   Since you have?

23   A.   Yes.

24   Q.   How far do you think you were from Mr. Randall when

25   you deployed the Taser the first time?

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 13

1    A.    Anywhere from five to twelve feet.

2          I honestly don't know.

3    Q.    Do you remember giving an estimate of ten to fifteen

4    feet in your statement?

5    A.    I don't.

6    Q.    Did you give a statement following this incident?

7    A.    I did.

8    Q.    Have you reviewed a transcript of that statement at

9    any time?

10   A.    No.

11   Q.    Have you ever wanted to review it?

12   A.    I don't know how to answer that.

13   Q.    I'm just wondering if it's something you wanted to

14   see.

15   A.    Of my interview with the Homicide detectives?

16   Q.    Yes.

17   A.    I mean I guess that's -- at this point that's

18   probably a good idea.

19   Q.    So you think you were five to twelve feet from him

20   when you deployed the Taser the first time?

21   A.    Honestly, it's been awhile.  I don't -- I don't want

22   to give an exact answer.  I don't know.

23   Q.    Are you comfortable with giving any estimate?

24   A.    Well, it's originally, I mean, yeah, ten to fifteen

25   feet.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 14

1      Q.   Did you give him any warning that you were going to

2   tase him?

3      A.   Not that I recall.

4      Q.   Were you trained when using the Taser you should

5   give a warning when feasible?

6      A.   When feasible, yes.

7      Q.   And prior to you tasing him, did he advance on you

8   in any way with this box cutter?

9      A.   He was pacing back and forth, but not directly at me

10   if I recall.

11      Q.   Had he verbally threatened to harm you at any time

12   before you tased him?

13      A.   No.

14      Q.   Was he pretty much in the same general area in the

15   aisle from the time you first saw him to the time you tased

16   him?

17      A.   Yes.

18      Q.   Did he try to run away from you at all before you

19   tased him?

20      A.   No.

21      Q.   Were you trained that tasing someone, one possible

22   reaction is they could try to run away?

23           MR. SMITH:  I'll insert my objection to the form of

24   the question.

25           But go ahead, Ms. Cassidy.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Corrin Cassidy on 06/14/2024

Page 15

1          THE WITNESS:  That's someone would run away if you

2    tase them?

3    BY MR. GALIPO:

4        Q.    Right.  Were you trained that one possible response

5    is they could run away not wanting to be tased?

6        A.    That's fair.

7        Q.    And were you trained that if the probes strike them

8    and enter their body, one possible response is they could try

9    to pull them out?

10        A.    Correct.

11        Q.    And where were you aiming on Mr. Randall when you

12    deployed your Taser?

13        A.    Upper torso area.

14        Q.    And could you tell whether the probes struck him?

15        A.    It did.

16        Q.    And could you tell where they struck him?

17        A.    They both connected to his upper body.

18        Q.    When you say the upper body, like the chest-abdomen

19    area?

20        A.    Yes.

21        Q.    And is it normally a five-second cycle?

22        A.    Yes.

23        Q.    And at some point did you see him trying to pull the

24    Taser wires out?

25        A.    Yes.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 17

```
 1   could -- I -- I reviewed video.  So what I observed on the

 2   video prior to and me actually dealing with him, I guess that

 3   could be where my vision is blurred as far as if that was me

 4   seeing it in person or if I was watching it on the video,

 5   but.

 6        Q.   You're saying when you watched the video, you saw

 7   him taking a drink, and now you're not sure whether that's

 8   something you saw on the video or something you actually saw

 9   on the day of the incident?

10        A.   Correct.

11        Q.   Now, after you tased him, is that when he started

12   running away from you?

13        A.   Yes.

14        Q.   And you would have still had the Taser in your hand

15   at that point?

16        A.   Yes.

17        Q.   And the X2, I think we talked about earlier, it has

18   two cartridges; correct?

19        A.   Yes.

20        Q.   And was Deputy Stanley generally to your left when

21   you were in the aisle?

22        A.   Yes.

23        Q.   And when Mr. Randall started running away from you,

24   did you give chase?

25        A.   Yes.
```

TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.
Corrin Cassidy on 06/14/2024

Page 18

1      Q.    And were you kind of staying more or less equal with

2   Deputy Stanley as you were pursuing Mr. Randall?

3      A.    Yes.

4            MR. SMITH:  I'm going to object to the form of the

5   question.

6            But go ahead.  You may answer, Deputy.

7            THE WITNESS:  Yes.

8   BY MR. GALIPO:

9      Q.    Yeah.  I think you did.  That's fine.

10           And so if I'm getting this correct, as you're

11  running down the aisle, you're more on the right side, and

12  Deputy Stanley is more on the left side or to your left?

13     A.    Yes.

14     Q.    And did you tase Mr. Randall at all while he was

15  running away?

16     A.    Not until he turned around and was then facing us.

17     Q.    And what would you say the distance was between you

18  and Mr. Randall as he was running down the aisle away from

19  you?

20     A.    The distance when he was running, or when I tased

21  him the second time?

22     Q.    When he was running.

23           I'm going to get the tasing in just a moment.

24     A.    Him running, I mean maybe a few feet.

25           I never actually thought about that.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Corrin Cassidy on 06/14/2024

Page 19

1      Q.   Okay.  When you say a few feet, how many do you have

2   in mind?

3      A.   Three, four.  I didn't feel like he was very far

4   ahead of us, but.

5      Q.   Were you trained when you observe someone with a

6   sharp-edged object in their hand, to try to keep a safe

7   distance from them?

8      A.   Yes.

9      Q.   And what distance were you trained to keep from

10   them?

11      A.   A -- I'm thinking the Taser, but a reasonable as to

12   when I was safe in that moment, I feel like it's case by

13   case.

14      Q.   What distance did you think it was safe to keep from

15   Mr. Randall?

16      A.   A specific answer, I don't think I have one, but

17   when you take into the totality of the fact that he's in a

18   crowded grocery store, I wanted -- I wanted to stop him as

19   soon as feasible.

20          So keeping a specific range of feet wasn't really

21   applicable in this scenario.

22      Q.   So you were not really thinking about keeping a safe

23   distance from him once he started running?

24          MR. SMITH:  I'll object to the form of the question.

25          But go ahead, Deputy Cassidy.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 20

1          THE WITNESS:  Of course, that's what I was trying to

2    do.  In most instances, if not all of the instances that I've

3    handled, you chase them until they stop running or you catch

4    them.

5          But in this case he turned around and it was -- it

6    then became very unsafe, but that was not something that -- I

7    mean as far as keeping a specific distance, I can't say that

8    I had that in my mind at the time.

9    BY MR. GALIPO:

10        Q.   Okay.  And I take it you wanted him to stop running;

11   is that a fair statement?

12        A.   That's fair.

13        Q.   And is one command you can give to someone when

14   they're running away from you to stop or stop running?

15        A.   It's fair.

16        Q.   Do you know if either you or Deputy Stanley told him

17   to stop?

18        A.   I can't speak for Stanley, but I know in that -- the

19   time from the first tase to the shooting, I was putting out

20   radio traffic.

21        So I wanted to broadcast to my partners that he's

22   now running towards the entrance to the store where my

23   partners are going to be entering.

24        Q.   So you believe you were putting out radio traffic at

25   that time?

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 21

```
 1      A.   I do.
 2      Q.   Did you give any commands to Mr. Randall when he was
 3   running away?
 4      A.   I don't believe I did.
 5      Q.   And with respect to Deputy Stanley, you're saying
 6   you're not sure because you were putting out the radio
 7   traffic?
 8      A.   Correct.
 9      Q.   But at least in your mind the hope was that he would
10   stop running?
11      A.   Yes.
12      Q.   And at some point as you get to the end of that
13   aisle, do you see him again?
14      A.   Yes.
15      Q.   Does he go out of your view for a short period of
16   time?
17      A.   Yes.
18      Q.   How long of a period of time was he out of your
19   view?
20      A.   Maybe a second, I think.
21      Q.   Before you tased him the second time, did you give
22   him any further commands?
23           MR. SMITH:  I'll object.  That assumes facts not in
24   evidence.
25           But go ahead, Ms. Cassidy.
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 22

1          THE WITNESS:  I -- I don't -- I don't recall.

2     BY MR. GALIPO:

3          Q.   Do you normally give someone commands or warning

4     before you tase them?

5          A.   Normally if there is time.

6          Q.   In this case do you recall one way or the other

7     whether you gave any commands or warning to him before you

8     tased -- activated your Taser the second time?

9          A.   I did not.

10         Q.   Did you hear him say anything to you when you saw

11    him again after him going out of your view for a second?

12         A.   No.

13         Q.   You pointed your Taser at him at some point?

14         A.   I did.

15         Q.   And how much time do you think passed between you

16    pointing your Taser at him again and you deploying it?

17         A.   I think it was just one motion.

18              I think it was at the same time.

19         Q.   And where was he positioned?

20              Was he at the end of the aisle or in between the two

21    aisles?

22              How would you describe it when you deployed your

23    Taser the second time?

24         A.   The three of us Stanley, Randall, and myself had

25    reached the end of the aisle, and he was -- he stood in front

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 23

 1   of the like the end cap of the aisle to the right of us as he

 2   was still facing the direction.

 3        Q.    And where were you aiming when you deployed your

 4   Taser the second time?

 5        A.    Upper torso, chest area.

 6        Q.    What would you estimate your distance from him when

 7   you deployed your Taser the second time?

 8        A.    Three to five feet.

 9        Q.    Did you have a sense of where Deputy Stanley was

10   when you deployed your Taser the second time?

11        A.    He was right next to me.

12        Q.    Would it be to your left?

13        A.    Correct, my left.

14        Q.    Let me show just a few exhibits that we used in the

15   last deposition.  We're going to try to screen share.

16             I'll use the same exhibit with the same numbers.

17             MR. GALIPO:  Can we please show Exhibit 1.

18             (Exhibit 1 was marked for identification.)

19             MR. SMITH:  And Mr. Galipo, just to double check.

20             So these are the same exhibits from previous, so we

21   don't need to I guess go through all the numerical, you know,

22   the time signatures.

23             MR. GALIPO:  Right.  They're the exact same ones,

24   Brett.

25             MR. SMITH:  Okay.  Thank you for clarifying.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 24

```
 1            MR. GALIPO:  You're welcome.
 2   BY MR. GALIPO:
 3       Q.   Are you able to see this still frame on your
 4   screen?
 5       A.   Yes.
 6       Q.   Okay.  And can you see yourself in this image?
 7       A.   Yes.
 8       Q.   And Deputy Stanley to your left?
 9       A.   Yes.
10       Q.   And Mr. Randall somewhere in the middle of the this
11   liquor aisle?
12       A.   Yes.
13       Q.   And how far do you think you are from Mr. Randall in
14   this image if you could tell?
15       A.   Ten feet, maybe.
16       Q.   Okay.
17            MR. GALIPO:  Could we go to Exhibit 2, please.
18            (Exhibit 2 was marked for identification.)
19   BY MR. GALIPO:
20       Q.   You have your Taser out at this time, if you could
21   tell?
22       A.   Yes.
23       Q.   And how far do you think you are from Mr. Randall at
24   this point?
25       A.   Maybe seven or eight.
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Corrin Cassidy on 06/14/2024

Page 26

| | |
|---|---|
| 1 | So do you think that's generally accurate? |
| 2 | A.    Yes. |
| 3 | Q.    Okay.  And prior to you deploying your Taser, did |
| 4 | Mr. Randall ever try to approach you or attack you or Deputy |
| 5 | Stanley in any way? |
| 6 | A.    No. |
| 7 | Q.    To your knowledge, had he committed any violent |
| 8 | crime up to the time you deployed your Taser? |
| 9 | A.    How would you describe violent crime? |
| 10 | I think at a minimum brandishing a weapon was |
| 11 | present, but. |
| 12 | Q.    Well, physically attacking anyone, threatening to |
| 13 | harm someone verbally, anything like that? |
| 14 | A.    No. |
| 15 | Q.    And so could we look at the next exhibit, please. |
| 16 | (Exhibit 3 was marked for identification.) |
| 17 | BY MR. GALIPO: |
| 18 | Q.    This is Exhibit 3. |
| 19 | Does this look to be like the time frame you're |
| 20 | deploying your Taser? |
| 21 | A.    Yes. |
| 22 | Q.    And did you see him react to it? |
| 23 | A.    Yes. |
| 24 | Q.    And at some point you saw him trying to pull the |
| 25 | probes out? |

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Corrin Cassidy on 06/14/2024

Page 27

```
 1      A.    Yes.

 2      Q.    Okay.

 3            MR. GALIPO:  Exhibit 4, please.

 4            (Exhibit 4 was marked for identification.)

 5   BY MR. GALIPO:

 6      Q.    This is when he's running away?

 7      A.    Yes.

 8      Q.    And you and Stanley are following him?

 9      A.    Yes.

10      Q.    Exhibit 5.

11            (Exhibit 5 was marked for identification.)

12   BY MR. GALIPO:

13      Q.    At some point when you're following him, he's

14   getting towards the end of the aisle?

15      A.    Yes.

16      Q.    Exhibit 6.

17            (Exhibit 6 was marked for identification.)

18   BY MR. GALIPO:

19      Q.    Was there a time when he went out of your view?

20      A.    I believe for a brief second or so.

21      Q.    And does he look to be out of your view at this

22   point?

23      A.    It looks like it.

24      Q.    Exhibit 7.

25            (Exhibit 7 was marked for identification.)
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 28

```
1   BY MR. GALIPO:
2       Q.   Do you remember tasing him a second time?
3       A.   Yes.
4       Q.   And was that about your position when you were
5   tasing him a second time?
6       A.   Yes.
7            And would you agree we can't.
8            MR. SMITH:  Sorry, Dale.  I just wanted to interpose
9   my objection.  It assumes facts not in evidence.
10           And we can move on.
11           MR. GALIPO:  Okay.
12  BY MR. GALIPO:
13       Q.   This is your approximate position when you deployed
14   the Taser the second time?
15       A.   That's fair.
16       Q.   Okay.  Can you see Mr. Randall in this image,
17   Exhibit 7?
18       A.   From this image, no.
19       Q.   Okay.  Where were you aiming on his person when you
20   deployed the Taser the second time?
21       A.   His upper torso, chest area.
22       Q.   And do you believe the second cartridge darts struck
23   him?
24       A.   I believe so, yes.
25       Q.   And in your interview you were asked how much time
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 29

1  you estimated passed between your second Taser darts and the

2  beginning of the gunfire.

3          Do you recall being asked that question?

4      A.  I don't recall.

5      Q.  On Page 29 of your interview, you said you think it

6  was only about a couple of seconds.

7      A.  From the first tase to the second?

8      Q.  No.  The second tase to the gunshots.

9          What would be your estimate of the time frame

10  between your second deployment and the gunshots?

11      A.  I would say a couple seconds, maybe less than

12  that.

13      Q.  And what did you see that made you believe your

14  Taser probes or darts struck him?

15      A.  I think my proximity was I was just -- like in that

16  moment there was so much happening.  I didn't know for

17  certain, but I knew my proximity, I was like, I'm pretty sure

18  that would have struck him.

19      Q.  Now, when the shots started do you recall hearing

20  like one of the objects in the store being struck?

21      A.  Yes.

22      Q.  And was that the soda bottles that exploded?

23      A.  Yes.

24      Q.  And also I take it Stanley's firearm was close to

25  your ear?

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 30

```
 1      A.   Yes.

 2      Q.   So was it the combination of the bottles exploding

 3   and the firearm being next to you that you lost your balance

 4   and fell?

 5      A.   And he was coming at me with a knife.

 6      Q.   But we don't see him in this photo; correct?

 7      A.   Right.

 8      Q.   And I think you never saw him actually walking or

 9   moving towards you taking steps towards you when you rounded

10   that corner, would you agree?

11           MR. SMITH:  I'll object to the form of the question.

12           But go ahead, Deputy Cassidy.

13           THE WITNESS:  Well, he had a knife raised in like

14   somewhat of a lunging manner, but I mean, taking steps, no.

15   BY MR. GALIPO:

16      Q.   How many shots did you hear from Deputy Stanley?

17      A.   I don't recall.

18      Q.   Did you see how he reacted to your second Taser

19   deployment, whether he was trying to take the prongs out that

20   time?

21      A.   I don't recall.

22      Q.   Did you hear multiple shots?

23      A.   Yes.

24      Q.   Did you hear any verbal warning that shots were

25   going to be fired?
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 31

1      A.   No.

2      Q.   Did anyone say anything to Mr. Randall in the couple

3   of seconds before the shots were fired?

4      A.   Not that I recall.

5      Q.   Do you recall Mr. Randall saying anything?

6      A.   No.

7      Q.   At some point did you see Mr. Randall on the ground

8   after the shooting?

9      A.   Yes.

10      Q.   Can we look at Exhibit 11, please.

11           (Exhibit 11 was marked for identification.)

12           MR. SMITH:  And just to double check, so we've gone

13   from 8 to 11?

14           MR. GALIPO:  Yes, we have.

15   BY MR. GALIPO:

16      Q.   Can you see Mr. Randall?  I know it's kind of a

17   distant shot here, but can you see generally where he is on

18   the ground?

19      A.   Yes.

20      Q.   And is that generally where you saw him on the

21   ground after you got up?

22      A.   Yes.

23      Q.   Did you have any injury, physical injury, from

24   this?

25      A.   No.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 32

```
 1        Q.   And one second, please.

 2             If we can look at Exhibit 8.

 3             (Exhibit 8 was marked for identification.)

 4   BY MR. GALIPO:

 5        Q.   Do you recall seeing Mr. Randall in that approximate

 6   position when you tased him?

 7        A.   Yes.

 8        Q.   And Exhibit 9.

 9             (Exhibit 9 was marked for identification.)

10   BY MR. GALIPO:

11        Q.   Do you recall seeing Mr. Randall moving backward at

12   some point when the shots started?

13        A.   I don't recall that.  I think I -- once I tased and

14   then fell to the ground, I don't remember seeing him because

15   I was now facing like the other direction.

16        Q.   Okay.

17             MR. GALIPO:  Thank you, Renee.

18   BY MR. GALIPO:

19        Q.   Did you approach Mr. Randall at all after he was on

20   the ground?

21        A.   Yes.

22        Q.   And this box cutter that he had initially, did you

23   see it anywhere in his hand or on his person or near him?

24        A.   No, not at the time.

25        Q.   Did you ever see that box cutter again before you
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 33

1    left the store?

2         A.    No.

3         Q.    Were you ever told where the box cutter was found?

4         A.    Exactly, no.  But it sounded like it was underneath

5    like the shelf or something.  I don't -- I don't recall.

6              It wasn't like immediately near his immediate

7    person.

8         Q.    It sounds like at some point you heard the casings

9    of Deputy Stanley hitting the floor or the ground; is that

10   correct?

11        A.    Yes.

12        Q.    Now, you're trained with respect to the use of the

13   Taser; you were trained that under certain circumstances you

14   can use a Taser against someone that has a knife or a

15   sharp-edged weapon; correct?

16        A.    Correct.

17        Q.    How long did you stay at the scene in the store

18   after the shooting?

19        A.    Maybe 20 minutes.

20        Q.    And where did you go from the scene?

21        A.    Back to the Victorville Station.

22        Q.    And did you go in any particular room once you got

23   there?

24        A.    The conference room.

25        Q.    Was anyone else with you in the conference room?

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 35

```
 1    A.   It was.
 2    Q.   Were you given the opportunity to look at any of the
 3   surveillance video before you gave your interview?
 4    A.   Yes.
 5    Q.   And you were able to do that?
 6    A.   Yes.
 7    Q.   And had you ever been present before for an
 8   officer-involved shooting?
 9    A.   No.
10    Q.   What is your current assignment?
11    A.   Patrol.
12    Q.   Same assignment as you had?
13    A.   Yes.
14    Q.   Okay.
15         MR. GALIPO:  We've been going for a while.
16         Is this a good time to take a ten-minute break?
17         MR. SMITH:  Yes.
18         (Recess taken.)
19   BY MR. GALIPO:
20    Q.   Did you see Mr. Randall as the shots were going off?
21         Were you looking at him?
22    A.   No.
23    Q.   So you tased him; at some point you stopped looking
24   at him; and then the shots were going off?
25    A.   I don't recall seeing it happen.  I think it was all
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Corrin Cassidy on 06/14/2024**

Page 36

```
 1  kind of -- I was falling as he was shooting is kind of how I

 2  gather.

 3       Q.    You did recognize the object as a box cutter,

 4  though; is that correct?

 5       A.    Correct.

 6       Q.    And at the time that you deployed your Taser, he was

 7  not running away; is that fair?

 8       A.    Yes.

 9       Q.    He was in that spot we saw him in that one still

10  photo at the end of the aisle?

11       A.    I mean with the knife raised in his hand is why I

12  deployed my Taser.

13       Q.    But I mean he wasn't at the time you deployed your

14  Taser, he wasn't backing up, and he wasn't moving forward.

15            He was just in that one spot; is that fair?

16       A.    That's fair.

17       Q.    And the reason why you deployed the Taser the second

18  time was you were hoping to disarm him?

19       A.    Correct.

20       Q.    Do you recall anything about his injuries?

21       A.    From the Taser or the gunshot wounds?

22       Q.    The gunshots, primarily.

23       A.    What exactly would you --

24       Q.    Well, I don't know.  Like, do you remember there

25  being shot to his arm or his chest or bleeding or anything
```