EXHIBIT C

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Edward T. Flost on 01/20/2025**

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3                     --oOo--

 4

 5   TODDERICK RANDALL, individually,

 6          Plaintiff,

 7   v.                    Case No. 5:24-cv-00086-SSS-SP

 8   COUNTY OF SAN BERNARDINO;
     CORRIN CASSIDY; CAMERON STANLEY
 9   and DOES 1-10, inclusive,

10          Defendants.
     _____/
11

12

13

14         STENOGRAPHIC REPORTER'S TRANSCRIPT OF

15            DEPOSITION OF EDWARD T. FLOSI

16              Monday, JANUARY 20, 2025

17

18

19

20

21   Reported Stenographically by:

22   KIMBERLY D'URSO, CSR 11372, RPR

23   Job No.  00130672

24

25
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Edward T. Flost on 01/20/2025**

```
 1                         APPEARANCES

 2

 3    FOR THE PLAINTIFF TODDERICK RANDALL:

 4              LAW OFFICES OF DALE K. GALIPO
                BY:  DALE K. GALIPO, ESQ.
 5                   RENEE MASONGSONG
                21800 Burbank Boulevard, Suite 310
 6              Woodland Hills, California 91367
                818.347.3333
 7              dalekgalipo@yahoo.com

 8
      FOR THE DEFENDANTS:
 9
                WESIERSKI & ZUREK LLP
10              BY: KATHRYN HARVEY, ESQ.
                29 Orchard Road
11              Lake Forest, California 92630
                949.975.1000
12              kharvey@wzllp.com

13

14
                        --oOo--
15

16

17

18

19

20

21

22

23

24

25
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Edward T. Flost on 01/20/2025**

Page 12

```
 1   certain circumstances, there is no time to evaluate the

 2   subjects's interpretation of the warning.

 3   BY MR. GALIPO:

 4       Q.   Are officers trained on the concept of

 5   "de-escalation"?

 6       A.   Yes.

 7       Q.   Are officers trained in how to deal with people

 8   that may be suffering from a mental illness or mental

 9   health crisis?

10       A.   Officers receive training on how to possibly

11   deal with people in mental crisis.

12       Q.   Are officers trained that they should attempt

13   to take a person into custody, if they can, with the

14   minimal amount of force?

15            MS. HARVEY:  Objection.  Incomplete

16   hypothetical.  Vague and ambiguous.  Calls for

17   speculation.

18            THE WITNESS:  Yeah, I don't believe there is

19   any standard of minimal level of force.

20   BY MR. GALIPO:

21       Q.   Is the safety of the suspect a consideration,

22   with respect to officers' training on use of tactics and

23   use of force?

24       A.   It is one of the considerations, the safety of

25   the officers, others, and the subject as well.
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Edward T. Flost on 01/20/2025**

Page 17

1    A.    Well, it's part of the criminal section and

2    defines when an officer can use reasonable force, and

3    then, specifically, reasonable deadly force.

4          I'm familiar with the section.  And based on my

5    understanding of the incident, there was nothing that

6    the deputies did that was outside of that Penal Code

7    section.

8    Q.    But I'm just wondering, are you aware that

9    that's part of the POST Learning Domain on deadly force?

10    A.    I know that it is called out in the Learning

11    Domain, yes.

12    Q.    And do you have an understanding as to when

13    that was added to the Learning Domain on deadly force,

14    approximately what year?

15    A.    It was shortly after the Assembly bill was

16    passed, I think in year 2000 -- no -- 2020.  I'm sorry.

17    Q.    So, to your knowledge, that was in effect at

18    the time of this shooting with Mr. Randall?

19    A.    It was.

20    Q.    And with respect to deadly force, is it your

21    understanding that officers are trained, and the POST

22    standard is you can use deadly force when there is a

23    reasonable perception of an imminent threat of death or

24    serious bodily injury to the officer or others?

25    A.    That's a good summary of the first standard,

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Edward T. Flost on 01/20/2025**

Page 18

1    yes.

2        Q.    And the second standard would apply to specific

3    facts that relate to a fleeing felon scenario?

4        A.    Yes, that's what it is generally referred to

5    as.

6        Q.    You would agree that second scenario doesn't

7    specifically apply to the case with Mr. Randall?

8        A.    I did not see anything in the evidence where

9    the deputies felt it was a fleeing felon type of

10   situation.

11       Q.    So when you analyzed this case in terms of the

12   use of deadly force, you were looking to the first

13   scenario that I just reviewed, about the reasonable

14   perception of the imminent threat of death or serious

15   bodily injury?

16       A.    Yes.

17       Q.    And is it your understanding that the POST

18   Learning Domain defines what "imminent" means, in terms

19   of this imminent threat requirement?

20       A.    It does have a definition, yes.

21       Q.    And tell me if this sounds familiar:  "An

22   imminent threat of death or serious bodily injury is

23   imminent when, based on the totality of the

24   circumstances, a reasonable officer in the same

25   situation would believe that a person has the present

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Edward T. Flost on 01/20/2025**

Page 19

1  ability, opportunity, and apparent intent to immediately

2  cause death or serious bodily injury to the peace

3  officer or another person."

4       Does that sound generally like the POST

5  language that you're familiar with?

6       A.   It sounds similar to the language that I'm

7  familiar with.  I don't have it up to read with you, but

8  it's similar.

9       Q.   Are you able to pull it up?

10      A.   I can.  Just give me a second.

11      Q.   Sure.

12           (Pause.)

13           THE WITNESS:  Let me make sure this is the

14  right one.  Yes.  Version 5.4 is what I'm looking at.

15  And chapter 4, page 4, has a paragraph that is similar to

16  what you just read off.

17      Q.   Can you please read the first sentence of that?

18      A.   Quote:  "A peace officer is justified in using

19  deadly force upon another person only when the officer

20  reasonably believes, based on the totality of the

21  circumstances, that such force is necessary...to defend

22  against an imminent threat of death or serious bodily

23  injury to the officer or another person."  And then it

24  references Penal Code Section 835(a)(c)(1)(a).

25      Q.   Okay.  And then the next sentence, please.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Edward T. Flost on 01/20/2025

Page 20

1    A.    That is the entirety of that sentence slash

2    paragraph.

3    Q.    Okay.  How about the next paragraph?  Does it

4    have the language in it that I referenced about the

5    "present ability, opportunity, and apparent intent"?

6    A.    Yeah.  On page 7 of chapter 4, yes, there is a

7    paragraph that sounds very familiar to what you read

8    off.

9    Q.    Okay.  Could you read the sentence that

10    includes the "present ability, opportunity, and apparent

11    intent"?

12    A.    "Imminent means:  A threat of death or serious

13    injury is 'imminent' when, based on the totality of the

14    circumstances, a reasonable officer in the same

15    situation would believe that a person has the present

16    ability, opportunity, and apparent intent to immediately

17    cause death or serious bodily injury to the peace

18    officer or another person."

19    Q.    Okay.  Thank you.

20          And then what's the next sentence?

21    A.    "An imminent harm is not merely a fear of

22    future harm, no matter how great the fear, and no matter

23    how great the likelihood of the harm, but is one that,

24    from appearances, must be instantly confronted and

25    addressed."

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Edward T. Flost on 01/20/2025**

Page 21

```
1        Q.   And did you -- at least in applying the

2   principles and POST standards, with respect to the use

3   of deadly force, did you take that into consideration,

4   what you just read, in forming your opinions in this

5   case?

6        A.   I did.

7        Q.   Would you agree that officers are generally

8   trained on POST standards when they attend the academy?

9        A.   When they are at the academy, they are taught

10  these POST standards.

11       Q.   And would you generally expect officers to be

12  trained on the standards, if amended, that apply to the

13  use of force, such as the one we just went over from the

14  Penal Code?

15       A.   I would expect that they receive refresher

16  training on use of force standards, yes.

17       Q.   Would you agree that officers are trained they

18  cannot shoot someone for merely seeing a weapon in their

19  hand, that fact alone?

20            MS. HARVEY:  Objection.  Vague and ambiguous.

21  Incomplete hypothetical.

22            THE WITNESS:  If we're leaving it to only

23  seeing and perceiving a weapon in the hand, with no other

24  facts or circumstances articulated, that would not be

25  enough to respond with deadly force.
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Edward T. Flost on 01/20/2025**

Page 22

```
 1  BY MR. GALIPO:

 2       Q.   Are officers trained that they should consider

 3   whether there are other reasonable options available,

 4   other than using deadly force?

 5            MS. HARVEY:  Objection.  Incomplete

 6   hypothetical.

 7            THE WITNESS:  It would depend on the timeline

 8   of the event.  If there is no imminent threat at the

 9   moment, and there's time to consider other things, then,

10   yes, other things can be considered.

11  BY MR. GALIPO:

12       Q.   Are officers trained that a verbal warning,

13   before using deadly force, should be given when

14   feasible?

15            MS. HARVEY:  Objection.  Incomplete

16   hypothetical.

17            THE WITNESS:  If it's feasible, based on the

18   time allowed by the subject and the circumstances

19   surrounding the event, yes.

20  BY MR. GALIPO:

21       Q.   Are officers trained that -- whether they

22   should consider their background or backdrop as a factor

23   when using deadly force?

24            MS. HARVEY:  Objection.  Incomplete

25   hypothetical.
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Edward T. Flost on 01/20/2025

Page 23

```
 1            THE WITNESS:  That is something that officers

 2  are trained to consider.  It is not a prohibited factor,

 3  though.

 4  BY MR. GALIPO:

 5      Q.   So based on the standard that we just talked

 6  about, would you agree that a fear of future harm alone

 7  is insufficient for an officer to use deadly force?

 8            MS. HARVEY:  Objection.  Vague and ambiguous.

 9  Incomplete hypothetical.  Calls for speculation.

10            THE WITNESS:  My understanding is that "the

11  future," as it appears in this particular sentence, means

12  that it's not happening right now.  In this case, my

13  understanding is it was happening right now.

14  BY MR. GALIPO:

15      Q.   I'm not talking about this case.  We're going

16  to get into that in just a second.  I'm just talking

17  about the general principle that officers are trained

18  they can't use deadly force based on a fear of future

19  harm, alone.

20      A.   Future, as in there's no threat present at the

21  time, yes.

22      Q.   And the threat present would be -- have to be,

23  obviously, an immediate threat of death or serious

24  bodily injury; correct?

25      A.   Yes, that would be the imminent threat.
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Edward T. Flost on 01/20/2025**

Page 24

1      Q.   So I guess a threat alone is not enough.   You

2   would need two parts of the threat.   One, it would have

3   to be immediate or imminent; correct?

4      A.   That is one of the parts of the standard.

5      Q.   And then the other part, it would not only have

6   to be immediate or imminent, but it would have to be a

7   threat of death or serious bodily injury?

8      A.   Based on the totality of the circumstances as

9   perceived or known by the officer at the time, yes.

10      Q.   Subjective fear is considered to be

11   insufficient to use deadly force; is that a fair

12   statement?

13      A.   I don't think the POST standard uses the term

14   "subjective fear."

15      Q.   They used to, didn't they?

16      A.   Not to my knowledge.   It's always been

17   unreasonable fear -- reasonable fear and unreasonable

18   fear.

19      Q.   You never remember them using "subjective

20   fear"?

21      A.   Not that I know of.   I can't remember it.   I

22   was teaching LD 20 since the year 2000.

23      Q.   Do you recall that LD 20, at some point, stated

24   that deadly force should only be used as the last resort

25   in the direst of circumstances?

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Edward T. Flost on 01/20/2025**

Page 26

1    any lethal force was used?

2        A.    Yes.    Deputy Stanley responded with deadly

3    force.

4        Q.    And is that S-T-A-N-L-E-Y?

5        A.    Yes, E-Y at the end.

6        Q.    Thank you.

7              And how many shots, if you know, did Deputy

8    Stanley fire?

9        A.    Seven.

10             MS. HARVEY:    Objection.    Lacks foundation.

11             THE WITNESS:    Sorry.    Seven, is my

12    understanding.

13    BY MR. GALIPO:

14       Q.    And what do you base that on?    What in the

15    materials did you see that led you to opine that he

16    fired seven shots?

17       A.    I believe the forensics and the round count

18    determined that it was seven rounds.    He believed --

19    based on his interview, I think he said four to five

20    times is what he thought.

21       Q.    And what type of weapon did he fire those

22    rounds from?

23       A.    It was a semi-automatic pistol.

24       Q.    And do you need to press the trigger for each

25    shot?

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Edward T. Flost on 01/20/2025

Page 27

```
 1      A.   Yes.  It's a semi-automatic.

 2      Q.   So your belief is that Deputy Stanley pressed

 3   the trigger seven times?

 4      A.   He would have had to press the trigger seven

 5   times to fire seven rounds, yes.

 6      Q.   And do you have an understanding as to how many

 7   of those rounds struck Mr. Randall?

 8      A.   I don't remember how many struck.  I know it

 9   wasn't all of them.

10      Q.   And do you know where the rounds that missed

11   went?

12      A.   Well, I think the first round actually went

13   into some of those bottles that were on the end cap, and

14   then some other rounds hit other items within the store.

15      Q.   And this was a grocery store?  Is that where

16   the shooting occurred, inside a grocery store?

17      A.   I think it's a -- I'm not familiar with what a

18   WinCo is.  I don't know if it's a grocery store or a big

19   box store, but it's some kind of retail store.

20      Q.   Okay.  And at the time of the first Tasing, did

21   you have an understanding as to the distance between the

22   deputies and Mr. Randall?

23      A.   I don't recall right offhand what the distance

24   was determined to be, but I know they moved a little bit

25   closer to get within effective Taser range.
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Edward T. Flost on 01/20/2025

Page 28

1    Q.    And what would be effective Taser range?

2    A.    To be effective, the best range is anywhere

3    between 7 and 15 feet.

4    Q.    And you believe they were within that range

5    when the Taser was initially deployed?

6    A.    I believe so.

7    Q.    Was any verbal warning given, based on your

8    review, that the Taser was going to be deployed?

9    A.    Yes.  There were several warnings to drop the

10   knife, the display of the Taser, before the Taser was

11   actually discharged.

12   Q.    I'm wondering a verbal warning:  "We're going

13   to Tase you," for example, "if you do something or don't

14   do something"?

15   A.    There was no warning that I'm aware of, as you

16   just stated.

17   Q.    Are officers trained that they should give a

18   verbal warning before using the Taser, when feasible?

19   MS. HARVEY:  Objection.  Incomplete

20   hypothetical.  Calls for speculation.

21   THE WITNESS:  If it's feasible based on the

22   time allowed by the subject and the circumstances

23   confronting the officers at the time, yes.

24   BY MR. GALIPO:

25   Q.    When the officers first observed Mr. Randall,

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Edward T. Flost on 01/20/2025

Page 29

1    based on your review, was he attacking any customer in

2    the store?

3         A.   He was not in the process of attacking anybody

4    when they first confronted him.

5         Q.   Did they have any information that he had

6    physically harmed any customer in the store, based on

7    your review?

8         A.   Up to that moment in time, no.

9         Q.   Based on the officer's observations, did

10   Mr. Randall charge at the officers at any time before

11   the first Taser was deployed?

12        A.   I don't know that I would use the word

13   "charged," but he certainly showed pre-assaultive

14   behaviors.

15        Q.   Well, did he walk in their direction, based on

16   your review, before the first Taser was deployed?

17        A.   He did move slightly closer, and flexed and

18   squared off, and moved the box cutter up and down while

19   looking at the officers.

20        Q.   Would you consider that walking in their

21   direction?

22        A.   I would consider that moving toward, and

23   pre-assaultive behaviors.

24        Q.   I get that part.  I'm just trying to figure

25   out, did you perceive him to be walking towards them, is

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Edward T. Flost on 01/20/2025

Page 30

1    what I'm asking?

2        A.    At the time of the Taser discharge, I don't

3    think he was walking toward the officers.

4        Q.    And do you have an understanding as to whether

5    the -- either of the Taser probes struck Mr. Randall in

6    the first Tasing?

7        A.    I know that Deputy Cassidy said that she

8    believed both probes hit Mr. Randall.  He did have some

9    physical response after the discharge, where he waved

10   his arms in front of his body, and most likely that

11   damaged one of the wires or disconnected one of the

12   probes from the device.

13       Q.    And what reaction did he have that you believe

14   was consistent with being struck by the Taser barbs?

15       A.    He flinched and folded forward slightly and

16   then waved his arms in front of his torso.

17       Q.    Now, you indicated that he had some

18   pre-assaultive behavior up to that point in time?

19       A.    Yes.

20       Q.    And in your opinion, as of the time of the

21   first Tasing, would it have been appropriate to use

22   deadly force on Mr. Randall?

23       A.    At that moment in time, I did not see any

24   deadly force factors.

25       Q.    And, for example, I take it if deadly force was

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Edward T. Flost on 01/20/2025**

Page 31

1  used at that point, your opinion would be it would have

2  been inappropriate?

3      A.   I would have to go back and reevaluate, but I

4  didn't see anything at that moment that would indicate

5  that a deadly force response was used or would have been

6  appropriate.

7      Q.   And when you say you didn't see any deadly

8  force factors, what factors are you referring to?

9      A.   I did not see anything that would rise to the

10  level of that imminent threat that we were speaking

11  about previously.

12      Q.   Would you agree there are situations, such as

13  this, where a Taser might be appropriate at a certain

14  point in time, but not deadly force?

15      A.   There are probably thousands of situations

16  where a Taser device discharge would be appropriate and

17  deadly force would not.

18      Q.   And what's the general standard for the use of

19  the Taser?  I know we talked about the standard that

20  relates to deadly force.  How about the standard that

21  relates to the use of the Taser?

22      A.   That the person is a threat of harm to somebody

23  and is at least at the level of active resisting.

24      Q.   And Tasers, based on the training, could be

25  used against someone, for example, like in this case,

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Edward T. Flost on 01/20/2025**

Page 32

1    that's holding what appears to be a box cutter?

2        A.    In this particular situation at that particular

3    time, a Taser device would be consistent with law

4    enforcement training.

5        Q.    And based on your review of the materials, did

6    the officers observe the box cutter in Mr. Randall's

7    hand before they deployed the Taser or before the one

8    deputy deployed the Taser?

9        A.    Yes.  My understanding is that both deputies

10   had seen the box cutter in Mr. Randall's right hand

11   prior to the Taser device discharge, first time.

12       Q.    And Mr. Randall had something else in his other

13   hand; is that correct?

14       A.    He had a large bottle of pre-mixed margarita

15   drink.

16       Q.    Okay.  Was he drinking from it, that the

17   officers observed, if you recall?

18       A.    I don't recall if the officers actually saw him

19   take a hit off the bottle, but they did say that it

20   appeared to be about halfway empty.

21       Q.    And were commands given to Mr. Randall to drop

22   the box cutter or drop the knife, prior to the Taser

23   being deployed?

24       A.    Yes, to my recollection, more than five times.

25       Q.    And I think you've answered this previously,

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Edward T. Flost on 01/20/2025

Page 33

 1  but someone just having a possession of a box cutter,

 2  that fact alone does not necessarily rise to the use of

 3  deadly force; is that fair?  There has to be more than

 4  that?

 5       A.   Yeah.  If we're just limited to the mere fact

 6  that the person had a box cutter on their person, that

 7  would not rise to the level of any kind of force

 8  response.

 9       Q.   And in this case, Mr. Randall had a box cutter,

10  the officers observed it, and then they gave him

11  multiple commands to drop it, at least initially; is

12  that fair?

13       A.   Those are some of the facts, yes.

14       Q.   And he did not drop it at that point; is that

15  also correct?

16       A.   He did not drop it prior to the first Taser

17  discharge, for certain.

18       Q.   And so would you agree, under the facts of this

19  case, just because someone has a box cutter and doesn't

20  drop it upon command, that doesn't rise -- at least up

21  to the time of the first Taser, that doesn't rise to the

22  level of using deadly force?

23            MS. HARVEY:  Objection.  Incomplete

24  hypothetical.

25            THE WITNESS:  Yeah.  If we're limiting it just

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Edward T. Flost on 01/20/2025**

Page 34

1  to the person that's possessing a box cutter and doesn't

2  drop it, that wouldn't necessarily rise to the level of a

3  deadly force response.

4  BY MR. GALIPO:

5      Q.   And that's why you indicated earlier, that in

6  your opinion, using deadly force at that point would not

7  have been appropriate?

8          MS. HARVEY:  Objection.  Vague and ambiguous.

9  Incomplete hypothetical.

10         THE WITNESS:  Yeah.  Based on all of the facts

11  that, as I understand it, it would not have been

12  appropriate for a deadly force response at the time of

13  the first Taser discharge.

14  BY MR. GALIPO:

15      Q.   And after the first Taser discharge, did

16  Mr. Randall move towards the officers or go to attack

17  the officers?

18      A.   No.

19      Q.   Did he move in some direction?

20      A.   He did.

21      Q.   And was that towards the officers or away from

22  the officers?

23      A.   It was away -- he ran away from the officers.

24      Q.   Have you seen that before in other cases you

25  have reviewed, someone being Tased and running away or

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Edward T. Flost on 01/20/2025

Page 35

1    trying to run away?

2        A.    More than likely.

3        Q.    That's not necessarily an uncommon response; is

4    it?

5        A.    That people run from police?   No.

6        Q.    And run from being Tased?

7        A.    Run from other -- being subjected to a Taser

8    discharge or any other level of force, it's not uncommon

9    that people run from police.

10       Q.    And was Mr. Randall, based on your review,

11   essentially running down the aisle that he was in, away

12   from the police, after he was Tased?

13       A.    He was running down the aisle, toward the end

14   cap, after the first Taser discharge.

15       Q.    And as he was running down the aisle, do you

16   think it would have been appropriate to use deadly force

17   against him?

18       A.    Based on the facts and circumstances as I

19   understand it, I don't believe that would rise to a

20   deadly force response.

21       Q.    And why not?

22       A.    Because it doesn't fall within the guidelines

23   that we talked about before, as being an imminent

24   threat, and it didn't rise yet to the level of being a

25   fleeing felon.

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Edward T. Flost on 01/20/2025

Page 37

```
 1      A.   Yes.  Cassidy discharged the second cartridge
 2   in her X2 device.
 3      Q.   And do you have an understanding as to when the
 4   deadly force started in relation to the second Taser
 5   deployment?
 6      A.   They were about at the same time.
 7      Q.   So the second Taser deployment and the first of
 8   the seven shots happened at about the same time?
 9      A.   At about the same time.  Not maybe at the exact
10   same time, but within that same moment in -- in time.
11      Q.   And based on your review, was Deputy Stanley
12   moving backwards during his firing of the shots or some
13   of the shots?
14      A.   He, at one point, did move backwards during the
15   course of fire.
16      Q.   And was Mr. Randall falling away from Deputy
17   Stanley at some point during the sequence of shots?
18      A.   Yes.  Randall -- Mr. Randall fell back and away
19   from the deputies during the course of fire.
20      Q.   Could you tell from looking at the video
21   whether any shots were fired as Mr. Randall started
22   falling to the ground?
23      A.   I don't remember if I was able to determine
24   that particular fact.
25      Q.   Did Deputy Stanley, based on your review, give
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Edward T. Flost on 01/20/2025

Page 38

1    any verbal warning that he was going to use deadly

2    force?

3         A.    He did not.

4         Q.    Were any commands given by either of the

5    deputies, from your review, after they turned that

6    corner?  So in the second or two before the second Taser

7    deployment and the deadly force, were there any commands

8    given?

9         A.    No.  When they turned the corner, there was no

10   time allowed by Mr. Randall for verbal commands.

11        Q.    So, for example, you don't recall anyone

12   telling Mr. Randall to "Drop it" after they turned the

13   corner?

14        A.    I don't remember if there was any

15   verbalizations after they turned the corner.

16        Q.    Do you have any general sense from reviewing

17   the materials what parts of Mr. Randall's body was

18   struck by the gunfire?

19        A.    I know that I reviewed the material, but I

20   don't recall, right at this moment, where he was struck.

21        Q.    Do you know if you included that anywhere in

22   your report?

23        A.    I may have.  I don't recall.

24        Q.    And after the shooting when Mr. Randall was on

25   the ground, based on your review, did either one of the

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Edward T. Flost on 01/20/2025

Page 39

```
 1    deputies eventually approach him?

 2         A.   Yes, they did approach him.

 3         Q.   And based on your review of the materials, was

 4    there any box cutter in his hand after the shots, when

 5    he was on the ground?

 6         A.   By the time the officers -- or the deputies got

 7    up to him, Mr. Randall did not have the box cutter in

 8    his hand after the shooting.

 9         Q.   Was the box cutter anywhere near his body -- I

10    mean within 3 feet after the shooting?

11         A.   It was what I would consider "near," based on

12    the facts and circumstances.  I don't know if it was 3

13    feet.

14         Q.   Do you know if either of the deputies, based on

15    your review, could even find the box cutter immediately

16    after the shooting?

17         A.   No.  They did not find -- the deputies that

18    were there, Stanley and Cassidy, did not locate the box

19    cutter.

20         Q.   So based on your review of the materials, they

21    went up to Mr. Randall after the shooting, and there was

22    no box cutter in his hand or on his person or around him

23    that they could find; is that fair?

24              MS. HARVEY:  Objection.  Vague and ambiguous.

25              THE WITNESS:  Those two deputies did not locate
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Edward T. Flost on 01/20/2025

Page 40

1    a box cutter in Mr. Randall's hand or within the

2    immediate area of Mr. Randall.

3    BY MR. GALIPO:

4        Q.    And is it your understanding that at some point

5    the box cutter was located later?

6        A.    That's my understanding.

7        Q.    And based on your review of the materials, was

8    there any blade in the box cutter that was located

9    later?

10        A.    I don't recall if there was an actual blade in

11    the box cutter by that time or not.

12        Q.    Do you know if the blade was ever located at

13    any time?

14        A.    I don't recall the status of the blade after

15    the shooting.

16        Q.    You don't recall reading anything that the box

17    cutter that was eventually located had no blade in it?

18        A.    Not specifically.  I remember looking at the

19    video, and it clearly shows that there was a blade in it

20    when he was standing face-to-face with the deputies.

21        Q.    I'm just wondering, are you saying that in the

22    documents that you've reviewed that you listed in your

23    report, you didn't review any document that indicated

24    that the box cutter was recovered after the shooting and

25    it did not have a blade in it?

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
**Edward T. Flost on 01/20/2025**

Page 42

```
1        Q.   Okay.  Let's assume all the same facts as we

2   have in this case until we get to just before the Taser

3   deployment and the lethal force deployment, and let's

4   say that Deputy Stanley rounds the corner and he notices

5   that Mr. Randall no longer has the box cutter.  He's not

6   sure where --

7            (Simultaneous speakers.)

8   BY MR. GALIPO:

9        Q.   He's not sure where it is, but he can see it's

10   not in either one of his hands.  This is my

11   hypothetical, of course.

12        A.   Okay.  And he's able to recognize that the box

13   cutter is no longer in play?

14        Q.   Yes.

15        A.   Then it would require a reevaluation by Deputy

16   Stanley.  And unless there was some other factors that

17   rose to the level of an imminent threat, it wouldn't

18   rise to the level of a deadly force response.

19            MR. GALIPO:  Okay.  We've been going about an

20   hour, and if this is good for everyone, we'll take about

21   a ten-minute break?

22            (Break taken.)

23   BY MR. GALIPO:

24        Q.   Do you have an estimate of how many current

25   cases you have with the County of San Bernardino
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Edward T. Flost on 01/20/2025

Page 50

```
 1   the depositions of the two deputies?

 2        A.   It doesn't appear that I have the depositions.

 3        Q.   Do you know if you ever asked for them?

 4        A.   I don't know if I asked for them, specifically.

 5        Q.   Having done other cases with you, would you

 6   agree, normally you do review the depositions when

 7   they're available?

 8        A.   If they've been taken and available, yes.

 9        Q.   And I know we've talked about this before, but

10   generally, in a jury trial, it's your understanding that

11   the jury decides the facts?

12        A.   They come to their own conclusion.

13        Q.   As to the facts and as to whether the use of

14   force was excessive or not?

15        A.   They do make their own determination on the

16   force.

17        Q.   And I know you keep a chart.  Maybe I should

18   look at that.  You have it in your report on page 2.

19   Can you turn to that just for a moment?

20        A.   Yes.

21        Q.   So you break down the type of case into

22   different categories?

23        A.   The chart has different categories, yes.

24        Q.   And it looks like, if I'm reading it correctly,

25   in a civil case defense, you have testified in court 42
```

**TODDERICK RANDALL vs COUNTY OF SAN BERNARDINO, ET AL.**
Edward T. Flost on 01/20/2025

Page 53

```
 1   STATE OF CALIFORNIA)
                        ) ss:
 2   COUNTY OF ALAMEDA  )

 3
             I, KIMBERLY E. D'URSO, do hereby certify:
 4

 5           That the witness named in the foregoing

 6   deposition was present and duly sworn to testify to the

 7   truth in the within-entitled action on the day and date

 8   and at the time and place therein specified;

 9           That the testimony of said witness was reported

10   by me in shorthand and was thereafter transcribed through

11   computer-aided transcription;

12           That the foregoing constitutes a full, true and

13   correct transcript of said deposition and of the

14   proceedings which took place;

15           Further, that if the foregoing pertains to the

16   original transcript of a deposition in a federal case,

17   before completion of the proceedings, review of the

18   transcript [ ] was [ ] was not requested.

19           That I am a certified stenographic reporter and

20   a disinterested person to the said action;

21           IN WITNESS WHEREOF, I have hereunder subscribed

22   my hand this 3rd day of February, 2025.

23   _____

24   KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```